IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

----------------------------------------------------------------------- X

MAURICE SHNAIDER, *et al.*,

                   Plaintiffs

                v.

AMERICAN MUSLIMS FOR PALESTINE, *et al.*

                   Defendants.

----------------------------------------------------------------------- X

Case No:
8:24-cv-01067-MSS-SPF

## <u>PLAINTIFFS' OMNIBUS OPPOSITION TO MOTIONS TO DISMISS OF DEFENDANTS AMP, BAZIAN, ABUIRSHAID, AHMAD, SARSOUR, AND SYED</u>

The Court should deny the Motions to Dismiss of Defendants AJP Educational Foundation, Inc. d/b/a American Muslims for Palestine ("AMP"),[1] Hatem Bazian ("Bazian"), Osama Abuirshaid ("Abuirshaid"), Munjed Ahmad ("Ahmad"), Salah Sarsour ("Sarsour"), and Shakeel Syed ("Syed") (collectively "Moving Defendants")[2].

These motions distort Plaintiffs' allegations and disregard the First Amended Complaint's ("FAC") detailed factual allegations. The FAC pleads concrete,

---

[1] Plaintiffs bring this action against American Muslims for Palestine ("AMP") and Americans for Justice in Palestine Educational Foundation, Inc. ("AJP"), which AMP acknowledges are a single entity, with "AMP" used as its fictitious name.

[2] Moving Defendants' papers assert that certain Defendants' names are mis-transliterated in the FAC. They say "Ahmed" should be "Ahmad"; "Saleh" should be Salah; and "Syed" should be Syed.

defendant-specific conduct—such as founding and directing AMP, creating Hamas-aligned student organizations in the US, coordinating mobilization campaigns, and supplying Hamas with services, personnel, financial services, and infrastructure it relied upon to execute terrorism. These allegations describe actionable conduct, not abstract speech or association.

Crucially, the FAC alleges conduct both before and after October 7. Before the attacks, Defendants constructed and sustained the infrastructure that Hamas relied upon to ensure its campaign of violence would resonate beyond Israel's borders. After the attacks, Defendants used that same infrastructure to amplify, justify, and operationalize Hamas's atrocities, transforming a localized massacre into international terrorism that achieved its intended coercive effect of intimidating civilians and influencing governments. If a terrorist bomb goes off in the forest and nobody hears it, it is not terrorism. October 7 became terrorism only because Defendants supplied the machinery that made Hamas's violence resonate worldwide. For these reasons, and as set forth below, the Motions to Dismiss should be denied.[3]

---

[3] Defendants' reliance on *Arthur-Rodger v. N. Trust Co.*, No. 8:23-cv-2551-MSS-TGW, 2025 U.S. Dist. LEXIS 14878 (M.D. Fla. Jan. 28, 2025), and *Manhart v. Wespac Found., Inc.*, No. 24-cv-08209, 2025 U.S. Dist. LEXIS 152019 (N.D. Ill. Aug. 7, 2025), is misplaced. Those cases involved plaintiffs who could not satisfy the elements of their claims or whose suits were deemed harassing (such as alleging a protest caused a missed flight). Here, by contrast, Plaintiffs plead specific facts: Defendants founded and directed AMP, built Hamas-aligned student networks, and sustained the infrastructure that amplified Hamas's violence. These well-pleaded allegations, accepted as true, establish actionable conduct under the ATA, not harassment.

**INTRODUCTION**

Plaintiffs, survivors and family members of victims of the October 7, 2023 Hamas terrorist attacks and their aftermath (the "October 7 Attacks"), bring this action under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(a) and (d), to hold Defendants civilly liable for knowingly aiding and abetting Hamas, providing it with material support and resources, and conspiring in furtherance of acts of international terrorism.

Moving Defendants' Motions to Dismiss rest on a distorted premise. Each introduction selectively highlights allegations about conventions, speeches, or student activities, while presenting Defendants as reputable figures in their communities—professors, lecturers, attorneys, writers, business owners, activists, academics, and nonprofit board members. Indeed, the motions go further and recite only those portions of the FAC that sound like protected expression or ordinary civic activity—such as Bazian's social media posts, Abuirshaid's speeches and newspaper work, Ahmad's quoted statement at an AMP convention, or Sarsour's business background—while omitting the FAC's central allegations that these same individuals, in their organizational roles, knowingly sustained Hamas's infrastructure and advanced its terrorist campaign. Moreover, the FAC details multiple incidents in which AMP, National SJP, and their campus chapters engaged in conduct that is plainly unprotected under the ATA—allegations Defendants completely disregard. This framing is calculated to obscure the FAC's actual allegations: that Defendants, in those very capacities, deliberately used their professional positions and public standing to build, direct, and sustain

organizations that ensured the success of Hamas's terrorist agenda —including by raising and channeling funds through AMP to National SJP and its SJP chapters (FAC ¶ 185), while even earlier financial ties by Defendant Sarsour underscore the longstanding pattern of support for Hamas (FAC ¶ 160), and through AMP's ongoing financial relationships with Hamas-linked intermediaries and fundraising campaigns in the US. (FAC ¶¶ 114–16, 141-43.)

The FAC must be read as a whole, not reduced to isolated snippets of speech or sanitized résumés. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322-23 (2007) (the plausibility inquiry requires courts to assess allegations collectively, not in isolation. Read as a whole, the pleading sets out a coherent narrative: after Hamas's prior U.S. fronts were shut down, Defendants assumed leadership roles in AMP, launched National SJP as its student arm, and ensured Hamas's propaganda, networks, and legitimacy continued in the US. Plaintiffs do not sue Defendants for abstract views. They sue them for their knowing roles in sustaining the organizational infrastructure that allowed Hamas's violent campaign to project into the US and culminate in the October 7 Attacks.

Each of the AMP-affiliated Defendants played a distinct role in this effort. Defendant Ahmad co-founded AMP in 2006 and served as its Vice Chairman, remaining centrally involved in its leadership. Defendant Bazian co-founded AMP, chairs its board, and founded National SJP as AMP's student arm to radicalize and mobilize US students in alignment with Hamas. Defendant Abuirshaid serves as AMP's Executive Director and previously as its National Policy Director. Defendant Sarsour serves on AMP's board of directors and chaired the convention

when AMP was formed. Defendants Syed and Ahmad, as AMP board members (with Ahmad also serving as Vice Chairman), provided organizational authority and continuity to its operations. (FAC ¶¶ 53-54, 60–62, 115, 122, 131, 194, 327, 406–07.) Together, as leaders and directors, these Defendants sustained AMP as the platform through which Hamas's ideology, propaganda, and networks continued to operate in the US through the establishment of National SJP and hundreds of SJP chapters. These roles are not mere expressions of personal belief or private association, but concrete positions through which each Defendant advanced AMP's function as a successor to prior Hamas fronts and as a vehicle for Hamas's U.S.-based activities.

At this stage, Rule 12(b)(6) requires only that Plaintiffs plausibly allege aiding-and-abetting, conspiracy, and material support liability under the ATA. Plaintiffs have done so. Whether discovery uncovers additional direct interactions with Hamas is for later phases. For now, the FAC more than plausibly states claims against these Defendants, and their motions should be denied.

## SUMMARY OF FACTS

Hamas was designated a Foreign Terrorist Organization under Executive Order 13224 on October 31, 2001, *see* https://www.state.gov/executive-order-13224/#state. Hamas is responsible for the October 7, 2023 Attacks, during which its operatives murdered, injured, raped, mutilated, burned alive, and kidnapped civilians, including US citizens.

As alleged, Hamas's campaign of violence depends not only on fighters and weapons but also on a global network of organizations and individuals furnishing

continuity, leadership, infrastructure, propaganda, fundraising, mobilization, and other forms of material support designed to intimidate civilians and influence government policy. (FAC ¶¶ 3–5.)

The FAC sets out a continuous chain of conduct. After the collapse of IAP, AMS, and HLF in the *Boim* litigation—where the Seventh Circuit held en banc that providing material support to Hamas, including financial and organizational continuity, creates ATA liability, *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 698-99 (7th Cir. 2008), Defendants deliberately established AMP in 2006 to carry forward the same structure, functions, and ideology under a new name. (FAC ¶¶ 114–16.) From its inception, AMP replicated its predecessors' leadership, propaganda, coordination, and financial ties to Hamas-linked intermediaries (FAC. ¶¶ 115–22, 126-29.)

Each Defendant occupied concrete positions in this successor structure:

- **Bazian** co-founded AMP, chairs its national board, and simultaneously founded National SJP, which he described as the "front line moving forward" by radicalizing U.S. students. (FAC ¶¶ 53, 115, 148, 154, 194, 215, 327.) He has repeatedly spoken at Hamas-linked fundraisers and defended Hamas's violent "resistance." (Id. ¶¶ 102, 154–155, 367.)

- **Abuirshaid** served as IAP's newspaper editor before becoming AMP's Executive Director. (FAC ¶¶ 116) He has maintained ties with Hamas leaders, appeared on Hamas's al-Qassam Brigades website, and continues to advance Hamas's agenda through financial coordination and propaganda activities. (Id. ¶¶ 118–20, 140, 355, 364, 389.)

- **Sarsour** is an AMP board member and chaired AMP's founding convention, has acted as a key fundraiser, and previously directed funds to Hamas's militant wing. (FAC ¶¶ 60, 160–61.)

- **Ahmad** co-founded AMP and served as its Vice Chairman, where he provided organizational legitimacy and continuity. At AMP's 2011 convention, Ahmad underscored AMP's mission by proclaiming that it was "the means to the end" of establishing "a free Palestine" and that AMP alone had "decided to take this challenge under the banner of Islam." (FAC ¶¶ 62, 122, 194.)

- **Syed** is an AMP board member and has, likewise, provided leadership and continuity, ensuring AMP functioned as a successor Hamas front. (FAC ¶ 61.)

Together, by sustaining AMP as founders, leaders, and directors, Defendants provided the incubator through which National SJP was launched and expanded, ensuring Hamas's US-based network of propaganda and mobilization endured into 2023-24. National SJP's creation in 2010, spearheaded by Bazian and AMP at a Hamas-linked BDS conference, was a central element of that continuity. (FAC ¶¶ 131, 150, 406–07.) Conceived as Hamas's student arm, National SJP grew to more than 200 chapters, embedding Hamas's messaging on U.S. campuses and cultivating students to normalize its rhetoric. Bazian himself described the effort as cultivating the "next generation." (*Id.* ¶¶ 131, 185, 193–201, 327, 355, 364, 367, 389, 406–13.)

Funding was integral. AMP raised and distributed funds through Hamas-linked entities, including a $100,000 transfer to SJP in 2014 and a 2022 national fundraising drive for National SJP to "increase support for student organizing." (FAC ¶¶ 116, 136, 185.) These were not isolated donations but part of a consistent pattern: AMP solicited funds via Hamas-linked intermediaries, used its conferences as fundraising vehicles, and funneled resources into National SJP to integrate campus organizing with financial support for Hamas's objectives. (Id. ¶¶ 141–43, 162, 168, 192.)

These allegations describe an unbroken chain of conduct in which Defendants built and directed US-based organizations as successor structures to Hamas's earlier fronts and vehicles for its terrorist campaign. Their coordinated efforts ensured the October 7 atrocities functioned as terrorism—legitimized, amplified, and operationalized to intimidate civilians, influence opinion, and pressure governments. October 7 itself was inseparable from Defendants' role: the violence became terrorism only because it was publicized, amplified, legitimized, and mobilized through the networks they built. Unlike the age-old paradox about whether a tree falling in the forest that nobody hears makes a noise, with terrorism the whole point is for people to hear of it and be influenced and intimidated. Publicity is the *sine qua non* of terrorism. That coercive impact—achieved by Defendants' amplification and mobilization—is precisely what defines "international terrorism" under the ATA. By ensuring Hamas's atrocities were reinforced and disseminated through these structures, Defendants' amplification

efforts not only secured the coercive success of the October 7 Attacks but also helped precipitate the subsequent campaign of violence.

Moving Defendants point to congressional correspondence from Representatives Mast and Comer requesting information from AMP, as if those political inquiries somehow undermine the FAC. (FAC ¶¶ 388–89.) But such letters actually bolster Plaintiffs' allegations, as they likewise identify AMP's ties to Hamas-linked entities and National SJP, reinforcing the detailed claims of organizational continuity, financial transfers, and leadership ties. Moreover, Comer's follow-up threatened subpoena and emphasized evidence linking AMP to National SJP. These congressional inquiries only underscore the seriousness of AMP's role.

## STANDARD OF REVIEW

A complaint survives a motion to dismiss under Fed. R. Civ. P. 12(b)(6) if it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plausibility standard "is not akin to a 'probability requirement,'" but simply requires "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. While "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" are insufficient, *id.*, a complaint need only plead enough facts to allow the court to draw the reasonable inference that the defendant is liable.

Defendants cite decisions such as *Gerow v. Newsom*, No. 8:22-cv-2976, 2024 U.S. Dist. LEXIS 80077 (M.D. Fla. May 2, 2024), and *Rivera v. Liberty Mut. Fire*

*Ins. Co.*, No. 6:25-cv-845, 2025 U.S. Dist. LEXIS 124930 (M.D. Fla. July 1, 2025), for the proposition that legal conclusions alone, without enough facts, cannot survive Rule 12(b)(6). Plaintiffs do not dispute that principle. The FAC pleads far more than conclusory assertions. It sets out specific historical, organizational, and operational facts, supported by public sources, that tie Defendants to Hamas's U.S.-based infrastructure and to the chain of events culminating in the October 7 Attacks.

At this stage, the Court must accept all well-pleaded facts as true and draw all reasonable inferences in Plaintiffs' favor. *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1321-22 (11th Cir. 2012); *Duke v. Cleland*, 5 F.3d 1399, 1402 (11th Cir. 1993). Whether Plaintiffs can prove those allegations with admissible evidence is a question for later stages of the case. For now, Rule 12(b)(6) requires only plausibility, not proof.

Plaintiffs allege not only that Hamas committed the October 7 Attacks, but that Defendants' U.S.-based infrastructure—sustained both before and after October 7—was a substantial factor in ensuring those atrocities functioned as terrorism under the ATA. Those allegations, accepted as true, more than satisfy Rule 12(b)(6).

## ARGUMENT

### I.    The FAC Plausibly Alleges That Defendants Themselves Committed Acts of International Terrorism

Defendant AMP states in the introduction of its Motion: "But Plaintiffs misdirect their lawsuit: instead of going after the perpetrators of the events that

caused their harm, Plaintiffs blame AMP based on its protected free speech within the United States." Plaintiffs are in fact going after the perpetrators of the October 7 Attacks. The violence may have been carried out by Hamas, but the conduct of AMP and the other Defendants in support of and promoting those attacks by a designated terrorist organization caught the pass and ran with it, giving material support to Hamas, and amplifying and aggrandizing what the October 7 murderers had done, and that conduct is not protected speech.

The ATA provides a civil remedy to "[a]ny national of the US injured…by reason of an act of international terrorism." 18 USC. § 2333(a). Congress deliberately defined "international terrorism" broadly. 18 USC. § 2331(1). Liability attaches not only to those who physically commit murder, bombings, or kidnappings, but also to conduct that "involve[s] violent acts or acts dangerous to human life" and is intended to intimidate or coerce. § 2331(1)(A)–(B). The Supreme Court has explained that even non-violent activities coordinated with an foreign terrorist organization are inseparable from its violent acts. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 26–27 (2010).

Terrorism is not defined solely by atrocities on the battlefield; it is equally defined by the exploitation of those atrocities to achieve political goals. The October 7 Attacks were designed to terrorize Americans, Israelis and Jews worldwide, coerce Israel and the American government, and shape international opinion. That transformation from atrocity into terrorism did not occur spontaneously. It depended on networks—including Defendants and their organizations—that amplified, justified, financed, and mobilized Hamas's

violence. Without this coordination, October 7 might have been a bloody crime; with it, the attacks became effective terrorism, achieving their intended coercive impact. That coordination is not incidental. It was foreseeable, deliberate, and defendant-specific.

Plaintiffs allege that AMP was established as the successor to Hamas's prior U.S. fronts and provided the infrastructure through which Defendants advanced Hamas's campaign. Most importantly, Bazian and AMP created National SJP, and together with the other Defendants, sustained it as the umbrella for SJP chapters nationwide. (FAC ¶¶ 56–62, 115-17, 131, 186-201, 258, 406-07).

National SJP was designed to function as the student arm of Hamas in the US, amplifying its propaganda, intimidating Jewish students, and orchestrating campus mobilizations that legitimized and magnified the October 7 Attacks. By creating, sustaining, and leading this coordinated network, Defendants ensured that Hamas's violence reverberated across American campuses and into the broader public sphere, transforming the October 7 Attacks from localized atrocities into international acts of terrorism. As the Supreme Court emphasized in *Holder*, it is practically impossible to distinguish between support for a group's violent and non-violent activities, as such support ultimately aids the terrorist organization as a whole, including its violent operations.

The ATA does not limit liability to those wielding the weapons. Those who publicize, justify, promote, and mobilize in coordination with terrorist atrocities commit acts that "***involve*** violent acts" under § 2331(1) (emphasis added). Such promoters help to accomplish the "intimidate[ion] or coerc[ion] of a civilian

population," and "influen[ing] the policy of a government by intimidation or coercion. 18 U.S.C. § 2331(1)(B)(i) and (ii). Plaintiffs' allegations therefore plausibly state claims that Defendants themselves committed acts of international terrorism.

## II.    The FAC Plausibly Alleges Aiding and Abetting

The ATA imposes secondary liability on anyone who "aids and abets, by knowingly providing substantial assistance" to acts of international terrorism. 18 USC. § 2333(d)(2). Courts assess such claims under the framework set out in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), as explained in *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023). Plaintiffs must plausibly allege: (1) a principal committed an act of international terrorism; (2) the defendant was generally aware of its role in an unlawful activity from which such acts were foreseeable; and (3) the defendant knowingly and substantially assisted the principal. *Taamneh*, 598 U.S. at 495-97. In evaluating substantial assistance, courts consider the six factors identified in *Halberstam*, 705 F.2d at 483-84.

General awareness does not require knowledge of the specific October 7 Attacks; it is enough that Defendants knew of their role in Hamas's terrorist enterprise. *Halberstam*, 705 F.2d 472 (D.C. Cir. 1983); *Taamneh*, 598 U.S. 471 (2023). Plaintiffs allege that AMP was formed as the successor to Hamas's dismantled US mobilization fronts and that its leaders—including Defendants— were fully aware of this history. (FAC ¶¶ 114–21, 126–29). Through campaigns and inciting propaganda, they reinforced Hamas's narrative of violent "resistance" and legitimated its terrorism as coercive political action. A central component of this

awareness was Defendants' role in creating and sustaining National SJP, which Plaintiffs allege functioned as the student arm of Hamas's US network. Bazian spearheaded National SJP's creation, while the other Defendants, through their roles as AMP's directors and officers, sustained and institutionalized its operations. (FAC ¶¶ 144-69.) By embedding Hamas's messaging across more than 200 campus chapters, Defendants ensured National SJP's expansion and permanence and thus cannot plausibly claim ignorance of their role in Hamas's broader terror campaign.

Substantial assistance is assessed through the six *Halberstam* factors. 705 F.2d at 483–84:

1. **Nature of the act encouraged.** Defendants advanced Hamas's violent campaign by building and directing organizations that supplied Hamas with continuity, legitimacy, and U.S.-based infrastructure, ensuring that the October 7 Attacks would achieve their terrorist effect. By creating National SJP, Defendants furnished Hamas with a durable platform to mobilize, fundraise, and project its campaign of violence into American universities.

2. **Amount and quality of assistance.** AMP, under Defendants' leadership, provided substantial and sustained support: organizational continuity, fundraising mechanisms, and coordinated propaganda. Through National SJP, they institutionalized Hamas's ideology across more than 200 campuses, multiplying Hamas's reach and impact.

3. **Presence at the time of the tort.** Although not physically present in Israel on October 7, Defendants' conduct before and after—creating US infrastructure, mobilizing support, channeling funds, and amplifying

Hamas's propaganda—ensured the attacks reverberated globally as acts of terrorism.

4. **Relationship to the tortfeasor.** AMP functioned as the successor to Hamas's prior US fronts, and the other Defendants knowingly operated in alignment with Hamas's objectives. National SJP, established by Defendants, extended that alignment by ensuring Hamas's October 7 violence did not remain an isolated atrocity but functioned as terrorism.

5. **State of mind.** The allegations show intentional, not inadvertent, conduct. Defendants knew Hamas was a designated FTO and relied on external propaganda, financing, and mobilization to magnify its attacks. Their actions deliberately reinforced Hamas's strategy.

6. **Duration of assistance.** Defendants' support was continuous, spanning nearly two decades. Their long-term leadership of AMP and creation and maintenance of National SJP supplied Hamas with enduring US-based infrastructure essential to its campaign.

Terrorism is not defined solely by violence but also by its exploitation to intimidate and coerce. *Boim* 549 F.3d at 698-99. The October 7 Attacks were terrorism not only because of the murders and kidnappings in Israel, but because they were amplified, legitimized, and mobilized abroad. Defendants' U.S. infrastructure transformed October 7 from an isolated atrocity into international terrorism under the ATA. National SJP, which Defendants established and supported, was integral to this infrastructure, ensuring Hamas's message was

disseminated and legitimized. Hamas itself acknowledged and thanked it's US
student arm. (FAC ¶¶ 374-79)

Defendants' reliance on *Manhart v. WESPAC Found., Inc.*, 2025 U.S. Dist.
LEXIS 152019 (N.D. Ill. Aug. 7, 2025), is misplaced. *Manhart* was a Rule 11
motion in a highway protest case asserting false imprisonment claims that failed as
a matter of law and were deemed harassing, turning on the absence of any
cognizable injury. Here, Plaintiffs bring ATA claims supported by detailed
allegations that Defendants sustained Hamas's successor infrastructure, occupied
leadership roles in AMP, and created National SJP as a nationwide platform that
amplified Hamas's violence, which made the October 7 Attacks terrorism under
the ATA and caused cognizable injury to Plaintiffs.

Defendants' reliance on *Parizer v. AJP Educational Foundation, Inc.*, No. 1:24-
cv-00724 (E.D. Va. Aug. 15, 2025), is likewise misplaced. Unlike in *Parizer*, where
the court dismissed "public relations" allegations largely focused on post–October
7 conduct, Plaintiffs here plead a detailed pre–October 7 record. The FAC devotes
116 of 210 pages—266 paragraphs—to the infrastructure Defendants created in the
US before October 7. It further documents, over pages 94-116, SJP's years-long
alignment with Hamas and its intimidation of Jewish students on US campuses,
culminating in the October 7 Attacks. That historical scaffolding is absent in *Parizer*.
Moreover, the ATA does not limit liability to the triggermen. As stated above,
under *Halberstam* and *Taamneh*, Plaintiffs need only plead general awareness of
Defendants' role in Hamas's enterprise and knowing, substantial assistance—not
foreknowledge of the precise attack. The FAC alleges both pre- and post-October 7

conduct: Defendants built and maintained the US infrastructure that ensured
Hamas's violence would resonate, and then used that same machinery to amplify,
justify, and operationalize the atrocities—turning a mass killing into terrorism
intended to intimidate civilians and influence governments. If a bomb goes off in
the forest and no one hears it, it is not terrorism; October 7 became terrorism
because Defendants supplied the mechanism that made Hamas's violence
reverberate worldwide. Finally, the FAC pleads contemporaneous facts supporting
scienter: after a five-month dormancy, Columbia SJP's Instagram reactivated on
October 5, 2023—two days before the attacks—with "We are back!!" and an image
of Israel in red, supporting a plausible inference of awareness of their role in
amplifying Hamas's campaign and of imminent escalation consistent with that role.
(FAC ¶ 297.) *Parizer* confirms only that conclusory allegations of 'systemic support'
untethered to the October 7 Attacks are insufficient; here, by contrast, Plaintiffs
plead specific pre-attack acts by these Defendants.

Taken together, these allegations satisfy *Halberstam*'s factors. The nature of
the acts encouraged was grave; the assistance was sustained and deliberate; the
relationship to Hamas was direct; and Defendants acted with awareness of their
roles. Their contributions were substantial factors in ensuring that Hamas's
violence succeeded as terrorism, including the October 7 Attacks.

## III.    The FAC Plausibly Alleges Conspiracy

ATA § 2333(d)(2) imposes secondary liability on "any person who conspires
with the person who committed" an act of international terrorism. To plead such a
claim, Plaintiffs need only allege facts that plausibly support the inference that

Defendants knowingly entered into an agreement—formal or informal—with Hamas to participate in acts of international terrorism. *See Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007). An agreement may be shown through circumstantial evidence reflecting a unity of purpose or a common design and understanding. *United States v Hartley,* 678 F2d 961 (11th Cir 1982).

The FAC pleads such an agreement. It alleges that Defendants used AMP to establish and direct National SJP, the central project embodying their conspiracy with Hamas. National SJP's creation in 2010 at a Hamas-linked conference reflected a unity of purpose: Defendants and Hamas-aligned coalitions jointly designed it as Hamas's U.S. student arm, embedding Hamas's messaging across more than 200 campuses. (FAC ¶¶ 131, 150, 194, 406-07.) The conspiracy's roots trace back to the 1993 Philadelphia meeting, where Hamas's Palestine Committee leaders (IAP, AMS, HLF) discussed opposing the Oslo Accords, cultivating youth curricula, and infiltrating universities to ensure a "next generation" resistant to peace with Jews. (FAC ¶¶ 144-45.) That strategy laid the groundwork for the very infrastructure Defendants later built and sustained.

Defendants' claim that AMP is a "stand-alone" entity is contradicted by allegations that its leadership—including Bazian, Abuirshaid, Ahmad, Sarsour, and Syed—founded and directed National SJP and ensured it functioned as Hamas's U.S. student arm. Congressional correspondence from Representatives Comer and Mast, likewise identifying AMP's ties to Hamas-linked entities and National SJP, further reinforces those allegations. (FAC ¶¶ 388-89.) At the pleading

-18-

stage, these allegations—and corroborating inquiries by congressional oversight—
must be accepted as true. *Twombly*, 550 U.S. at 556; *Iqbal*, 556 U.S. at 678.

National SJP's creation and expansion itself evidences the conspiracy.
Bazian provided the ideological framework; Abuirshaid, as Executive Director,
translated that framework into national campaigns; and Ahmad, Syed, and
Sarsour, as AMP directors, maintained the organizational continuity and
legitimacy necessary for National SJP to operate as a coordinated mechanism.
Collectively, these roles manifested Defendants' agreement to work in tandem with
Hamas to advance its terrorist campaign.

Defendants argue that the FAC is merely a "rote recitation of the elements
of a conspiracy claim." That contention is unfounded. Courts recognize that
circumstantial allegations of collaboration and shared objectives suffice. See *Atchley
v. AstraZeneca UK Ltd.,* 22 F.4th 204, 220-21 (D.C. Cir. 2022); *Freeman v. HSBC
Holdings PLC*, 413 F. Supp. 3d 67, 93 (E.D.N.Y. 2019). The FAC does not rely on
labels or conclusions, but details years of coordinated conduct in which
Defendants—through AMP and in coalition with Hamas-linked entities—jointly
designed and institutionalized National SJP as Hamas's U.S. student arm. Unlike
in *Lavi v. UNRWA USA Nat'l Comm., Inc.*, 2025 U.S. Dist. LEXIS 153757, where
the conspiracy claim failed because plaintiffs did not allege interaction among the
supposed conspirators, Plaintiffs pleads repeated collaboration, shared objectives,
and structural alignment. These allegations provide a concrete basis for conspiracy
liability well beyond formulaic pleading.

As *Halberstam* makes clear, once a conspiracy is formed, "all its members are liable for injuries caused by acts pursuant to or in furtherance of the conspiracy," regardless of whether they personally carried out the injurious act. 705 F.2d at 481. Plaintiffs need not show Defendants personally orchestrated October 7. It is enough that they knowingly joined and sustained a conspiracy with Hamas whose purpose was to advance terrorist violence.

At the pleading stage, Plaintiffs are not required to allege the exact mechanics of the agreement. *See Peters v. Amoco Oil Co.*, 57 F. Supp. 2d 1268 (M.D. Ala. 1999) (recognizing that when defendants act in concert, plaintiffs may plead group conduct and develop individual liability through discovery). Plaintiffs plausibly allege sustained collaboration, shared objectives, and continuity of leadership and organizational infrastructure, such that Defendants' participation was not incidental but part of an enduring conspiracy to advance Hamas's strategic aims, including October 7. That is sufficient to state a claim under § 2333(d)(2).

## IV.    The FAC Plausibly Alleges Material Support in Violation of the ATA

ATA § 2333(a) provides a civil remedy to "[a]ny national of the United States injured…by reason of an act of international terrorism." 18 USC. § 2333(a). That requirement is satisfied where a defendant violates 18 USC. § 2339B by "knowingly provid[ing] material support or resources to a foreign terrorist organization." § 2339B(a)(1). "Material support" includes "any service, personnel…or other physical assets." § 2339A(b)(1). The Supreme Court in *Holder* made clear that such support—even if styled as advocacy—is not protected speech

when undertaken "in coordination with or at the direction of" a designated FTO.

*Holder*, 561 U.S. at 26–27, 39

### A. Defendants' Conduct Constitutes Material Support

The FAC alleges that AMP knowingly founded and sustained National SJP
as the student arm of Hamas's U.S. network, embedding Hamas's messaging into
more than 200 campus chapters to cultivate students as recruits and organizers for
Hamas's agenda, long before and after October 7. (FAC ¶¶ 131, 185–201, 327, 355,
364, 367, 389, 406-13.) The individual Defendants—Bazian, Abuirshaid, Ahmad,
Sarsour, and Syed—served as directors and leaders of AMP, and by doing so,
knowingly sustained AMP's role in creating and supporting National SJP's
nationwide network**.** (*Id.* ¶¶ 60, 114–22, 161, 194.)

These activities also extended to financing Hamas directly. AMP continued
the fundraising model of its predecessors (IAP/AMS/HLF) by soliciting funds
through Hamas-linked intermediaries such as Baitulmaal, Zakat Foundation,
Islamic Relief, United Muslim Relief, and Union of Good, all of which disbursed
funds through Hamas operatives. (FAC ¶ 136.) AMP also hosted and organized
major fundraisers for Viva Palestina, during which its leaders—including
Abuirshaid—knowingly supported the direct transfer of funds and equipment to
Hamas officials, including Hamas leader Ismail Haniyeh. (FAC ¶¶ 141–43.) In
addition, AMP funneled six-figure sums into SJP and National SJP, such as a
$100,000 transfer in 2014, along with highly publicized distributions of large checks
to SJP chapters and a 2022 national fundraising drive to "increase support for
student organizing." (FAC ¶ 185.)

By raising funds through Hamas-linked intermediaries, channeling resources into SJP and National SJP, and sustaining U.S.-based infrastructure for propaganda and mobilization, Defendants materially supported Hamas's terrorist enterprise. These efforts provided Hamas with financial lifelines, organizational continuity, recruitment channels, and propaganda platforms—precisely the kinds of support courts have recognized as actionable "material support." *See Boim,* 549 F.3d at 698-99.

### B. Moving Defendants Acted with the Requisite Scienter

Section 2339B requires only that the defendant know the organization is a designated FTO or has engaged in terrorism, not that the defendant intends to further any particular terrorist attack. *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329-30 (2d Cir. 2018). The FAC pleads knowledge by showing that AMP, as the successor and offshoot of IAP and AMS—both previously tied to Hamas—deliberately founded National SJP at a conference sponsored by the BDS National Committee, which included Hamas. It further alleges that the individual Defendants knowingly sustained AMP's leadership role in expanding National SJP into a nationwide campus movement aligned with Hamas. See *United States v Suarez,* 893 F3d 1330 (11th Cir 2018) (upholding conviction under § 2339B where defendant knowingly directed services to ISIS through propaganda, recruitment, and coordination with perceived ISIS members).

The FAC also pleads specific facts showing scienter. Abuirshaid, AMP's Executive Director, was previously an editor for IAP's pro-Hamas newspaper and appeared on Hamas's own al-Qassam Brigades website. (FAC ¶¶ 118–20) Sarsour,

an AMP board member, personally transferred funds to Hamas's militant wing.
(Id. ¶¶ 160–61.) AMP openly partnered with Viva Palestina to channel funds and
equipment directly to Hamas leaders, including Ismail Haniyeh. (Id. ¶¶ 141–43.)

### C. Plaintiffs Plausibly Plead Proximate Cause

Defendants argue that Plaintiffs merely recite the elements of material
support, fail to show proximate cause, and at most allege "independent advocacy."
That contention mischaracterizes the FAC. ATA liability extends to conduct that
qualifies as "international terrorism" under § 2331(1), including coordinated
material support to Hamas—not just those who directly participate in violence.
*Holder,* 561 U.S. at 26–27; *Weiss v. Nat'l Westminster Bank PLC,* 993 F.3d 144, 162–
63 (2d Cir. 2021).

The FAC alleges deliberate, defendant-specific conduct: Defendants
sustained Hamas's U.S. successor infrastructure, created and institutionalized
National SJP as Hamas's student arm, and channeled financing and propaganda
that amplified Hamas's campaign of violence. That conduct goes well beyond
advocacy. It materially advanced Hamas's ability to intimidate civilian populations
and influence governments by ensuring its violence reverberated globally as
terrorism. The FAC pleads that Defendants' material support was not fungible or
passive. It was tailored to Hamas's strategy of using global intimidation to magnify
its battlefield violence. By furnishing the infrastructure, personnel, organizational
services, and propaganda platforms, Defendants provided the precise form of
support Hamas required for October 7 to succeed as terrorism. See *In re Chiquita
Brands Int'l, Inc., 284 F. Supp. 3d 1284* (2018) (finding proximate cause sufficiently

pled where financial support foreseeably enhanced a terrorist group's capacity and was a substantial factor in the resulting harm).

Defendants' citation to *Gerwaski v. Nevada ex rel. Bd. of Regents*, 2025 U.S. Dist. LEXIS 84645, at 15 (D. Nev. May 5, 2025), is misplaced. *Gerwaski* was dismissed because the plaintiff was not injured in the October 7 Attacks and alleged only vague reputational harms from campus rhetoric, without connecting those harms to any act of international terrorism. By contrast, Plaintiffs here allege concrete injuries directly from Hamas's October 7 Attacks. They further plead detailed facts showing Defendants' long-standing provision of personnel, services, financial channels, and organizational continuity that materially furthered Hamas's ability to carry out those attacks. Unlike in *Gerwaski*, the FAC does not rest on abstract "advocacy" but on sustained conduct that supplied Hamas with the U.S.-based infrastructure necessary to transform October 7 into terrorism with global coercive effect.

### D. The Allegations More Than Suffice at the Pleading Stage

At this stage Plaintiffs need not detail every operational step between Defendants' conduct and the October 7 Attacks. The FAC pleads facts showing that Defendants' knowing provision of infrastructure, financial services, personnel, and operational capacity materially enhanced Hamas's ability to execute its campaign of violence. See *Colon v. Twitter, Inc.,* 14 F.4th 1213, 1223 (11th Cir. 2021) (noting conflicting formulations of proximate cause). Plaintiffs' allegations satisfy either formulation: they allege a direct relationship between Defendants' conduct and Hamas's campaign, and they allege that Defendants' support was a substantial

factor in the sequence of events leading to the October 7 Attacks and that the resulting injuries were reasonably foreseeable. See *Owens v. BNP Paribas S.A.*, 897 F.3d 266, 273 (D.C. Cir. 2018); *In re Chiquita Brands Int'l*.

## V.    Plaintiffs' Claims Target Unprotected Conduct, Not Protected Speech

Defendants seek dismissal by reframing this case as an attempt to suppress political expression and association. That framing mischaracterizes the FAC. Plaintiffs do not allege liability for independent advocacy "in support of Palestinians." Rather, the claims focus on AMP's deliberate provision of organizational infrastructure to Hamas, a designated FTO, and the individual Defendants' knowing leadership in sustaining that infrastructure. Such conduct is not shielded by the First Amendment.

The Supreme Court has drawn a clear line: abstract advocacy is protected, but the "knowing provision of material support to a foreign terrorist organization" is not—even when such support takes the form of coordinated messaging or training. *Holder*, 561 U.S. at 26–27, 39. Defendants' reliance on *Snyder v. Phelps*, 562 U.S. 443 (2011), and *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), is misplaced. Those cases involved independent advocacy or protest divorced from coordination with terrorist organizations. None immunize the provision of organizational infrastructure knowingly coordinated with Hamas.

The FAC pleads that AMP co-founded National SJP as Hamas's U.S. student arm, embedding Hamas's messaging and networks on American campuses. It further alleges that Defendants Bazian, Abuirshaid, Ahmad, Sarsour, and Syed,

as AMP's directors and leaders, knowingly sustained AMP's role by expanding National SJP into a nationwide campus movement to normalize Hamas's terrorist agenda, furnishing platforms and resources for campaigns glorifying and defending Hamas's violence, and channeling financial support—including six-figure transfers and national fundraising drives—into SJP and National SJP to underwrite that infrastructure. (FAC ¶¶ 131, 150-55, 185, 191–206, 355, 364, 367, 389, 406–11.) These are actionable contributions of organizational capacity and infrastructure— not "independent advocacy." As *Holder* and the Eleventh Circuit's decision in *US v. Jayyousi*, 657 F.3d 1085, 1102–03 (11th Cir. 2011), make clear, coordinated activity with an FTO falls outside First Amendment protection. *See also US v. Mehanna*, 735 F.3d 32, 45 (1st Cir. 2013).

The distinction matters. Terrorism's coercive power depends not only on the violent act itself but also on amplification and mobilization that extend its psychological and political reach. By building and directing the very networks that performed that function, Defendants ensured that Hamas's atrocities—including the October 7 Attacks—were not isolated crimes but effective acts of international terrorism. Plaintiffs thus do not seek to punish dissent but to hold Defendants liable for providing the infrastructure that enabled Hamas to weaponize October 7 and its aftermath into coercive terrorism.

## CONCLUSION

For the foregoing reasons, Moving Defendants' motions should be denied in their entirety, and permit Plaintiffs to proceed with their claims under the ATA.

Dated:    Brooklyn, New York
          August 29, 2025

                            Yours,

                            **THE BERKMAN LAW OFFICE, LLC**
                            *Attorneys* for Plaintiffs

                            by:    /s/ Robert J. Tolchin
                                   Robert J. Tolchin

                            829 East 15th Street, Box 7
                            Brooklyn, New York 11230
                            718-855-3627

Of Counsel:

NITSANA DARSHAN-LEITNER & CO.
Nitsana Darshan-Leitner
*Israeli Attorney for Plaintiffs*
10 Hata'as Street, Ramat Gan, 52512 Israel
Israeli #: 011-972-523-837-020
U.S. #: (212) 591-0073

## CERTIFICATE OF SERVICE

I hereby certify that this Motion filed through the ECF system is expected to be sent electronically to the registered participants as identified on the court's docket.

/s/Robert J. Tolchin
Robert J. Tolchin