## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

------------------------------------------------------------------- X

MAURICE SHNAIDER, *et al.*,

                        Plaintiffs

                                            Case No:
                                            8:24-cv-01067-MSS-SPF

            v.

AMERICAN MUSLIMS FOR PALESTINE, *et al.*

                        Defendants.

------------------------------------------------------------------- X

### PLAINTIFFS' OPPOSITION TO DEFENDANT ZAREFAH BAROUD'S MOTION TO DISMISS

The Court should deny the Motion to Dismiss filed by Defendant Zarefah Baroud ("Baroud"). Defendant's arguments distort Plaintiffs' allegations and disregard the First Amended Complaint's ("FAC") detailed factual narrative. Contrary to Baroud's assertion that Plaintiffs have made only a "sole allegation" against her, the FAC must be read as a whole. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007). When read as a whole, the FAC sets out a coherent and plausible narrative: after Hamas's prior U.S. fronts were dismantled, Baroud assumed a leadership role within American Muslims for Palestine ("AMP"), as Digital Media Associate managing propaganda and supporting National Students for Justice in Palestine ("NSJP"). Through her leadership role in AMP's social media operations, Baroud knowingly sustained Hamas's propaganda, networks, and legitimacy in the U.S., strengthening the organizational

infrastructure that projected Hamas's violent campaign onto U.S. soil and culminated in the October 7 Attacks. Plaintiffs bring claims against Baroud not for isolated conduct, but for her integral role in a coordinated structure.

Crucially, the FAC alleges conduct before and after October 7. Before the attacks, Defendants built and sustained the infrastructure that Hamas relied upon to ensure its campaign of violence would resonate beyond Israel's borders. After the attacks, Defendants used that same infrastructure to amplify, justify, and operationalize Hamas's atrocities, transforming a localized massacre into international terrorism that achieved its intended coercive effect of intimidating civilians and influencing governments. If a terrorist bomb goes off in the forest and nobody hears it, it is not terrorism. October 7 became terrorism only because Defendants supplied the machinery that publicized and popularized Hamas's violence and made it resonate worldwide. For these reasons, as set forth, the Motion to Dismiss should be denied.

## FACTUAL BACKGROUND

Plaintiffs are survivors and family members of victims of Hamas's October 7, 2023 terrorist attacks and their aftermath (the "October 7 Attacks"). They bring this action under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(a), (d), to hold Defendants civilly liable for knowingly aiding and abetting Hamas, providing material support, and conspiring in furtherance of acts of international terrorism.

The conspiracy alleged traces back to the 1993 "Philadelphia meeting" of the Hamas-affiliated Palestine Committee, where Hamas leaders in the U.S. strategized to oppose the Oslo Accords by mobilizing youth, infiltrating

universities, and building support for Hamas (FAC ¶¶ 144-45). Participants emphasized university infiltration and youth mobilization. These early efforts planted the roots for what later became the network of AMP, NSJP, and SJP chapters.

After Hamas's earlier U.S. fronts, IAP/AMS and HLF, collapsed under the *Boim* litigation, AMP was formed in 2006 to deliberately carry forward the same ideology. *See Boim v. Holy Land Found.*, 549 F.3d 685 (7th Cir. 2008). The FAC details the leadership overlap and succession (FAC ¶¶ 114-22, 126-29).

From this foundation, NSJP emerged as Hamas's student arm in the U.S. The FAC traces how SJP chapters systematically advanced Hamas's agenda, spreading its propaganda and intimidating Jewish students on American campuses for several years prior to the October 7 Attacks (FAC ¶¶ 224-70). The October 7 Attacks exposed this alignment with striking clarity. Columbia SJP, for example, lay dormant for months before suddenly reactivating on October 5, 2023—two days before the attacks—with the post "We are back!!" (FAC ¶ 297). Immediately after the massacre, NSJP issued its "Day of Resistance Toolkit," directing SJP chapters to fall into lockstep with Hamas and glorify the atrocities (FAC ¶¶ 278-96).

SJP chapters complied, harassing and intimidating Jewish students, praising Hamas "martyrs," and aligning with Hamas's violence (FAC ¶¶ 298–333, 380–86). Encampments formed nationwide, where chants called for Israel's elimination "from the river to the sea" and "Intifada" (FAC ¶¶ 224, 288, 316, 326, 327, 343–73). Hamas itself praised and encouraged these campus activities (FAC ¶¶ 374-79).

These events triggered congressional investigations into AMP and NSJP/SJP chapters for their ties to Hamas (FAC ¶¶ 387-89).

Against this backdrop, Baroud's role is clear. As AMP's Digital Media Associate, she produced propaganda for dissemination to SJP chapters and assisted NSJP's social media activity, and did so for years (FAC ¶¶ 55, 158). In that position, she was not incidental but part of the infrastructure that ensured Hamas's terrorist messaging was amplified and legitimized in the U.S. Her work amplified Hamas's intimidation and coercion.

Baroud argues that she is mentioned only a few times in the FAC and such limited references render the claims against her conclusory. That contention misstates both the law and the FAC. The FAC must be read as a whole, and when read in context, it sets out a coherent chain of conduct in which Baroud's role is plainly alleged. The FAC lays out Baroud's position as AMP's Digital Media Associate, her role in producing propaganda for dissemination to SJP chapters, and her coordination of NSJP's social media activity (FAC ¶¶ 55, 158). It further alleges that since at least 2019 she has overseen AMP's social media operations and assisted NSJP's online activity, in a role previously held by Sami Al-Arian's daughter. At the same time, AMP's executive director Defendant Abuirshaid has regularly traveled to Turkey to meet with Al-Arian—convicted in the U.S. in 2006 for providing material support to PIJ—at events hosted by CIGA, where Baroud's father serves as a "scholar." These allegations are not pled to impute liability to Baroud for her father's or Al-Arian's actions, but to demonstrate the continuity of personnel, roles, and relationships that make up the conspiracy. Her position within

AMP's propaganda and media structure was part of a pattern of coordination and embeddedness in Hamas's U.S.-based support network.

Nor is the FAC a "shotgun pleading." Courts have consistently rejected that label where, as here, the complaint contains defendant-specific allegations detailing each defendant's role. *Merino v. Ethicon Inc.*, 536 F Supp 3d 1271 (SD Fla 2021); *Restless Media GmbH v. Johnson*, 704 F Supp 3d 1288 (SD Fla 2023). This case is readily distinguishable from *Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1322–23 (11th Cir. 2015). The FAC carefully attributes specific roles and conduct to each Defendant while also pleading the interconnected nature of their conspiracy with Hamas. Cross-references reflect coordinated roles. Hamas operates through interlocking organizations and individuals. The FAC traces that web from IAP/AMS and HLF to AMP and NSJP and identifies Baroud's role within it. Terrorism depends on each part of the network functioning together, and the FAC makes clear that Baroud's role is pled as one such part.

Nor can Baroud escape liability by mischaracterizing the FAC's allegations about AMP's succession. Plaintiffs do not "conclude" AMP was a successor; they plead it as a factual matter supported by specific allegations showing leadership overlap and organizational continuity.

Defendants' coordinated efforts ensured that the October 7 atrocities functioned as terrorism—legitimized, amplified, and operationalized to intimidate civilians, influence opinion, and pressure governments. October 7 was inseparable from each Defendant's role: the violence became terrorism only because it was publicized, amplified, legitimized, and mobilized through the networks they built.

Baroud was part of this network. Unlike the age-old paradox of whether a tree falling in the forest that nobody hears makes a noise, with terrorism the point is for people to hear it and be intimidated. The publicity is the *sine qua non* of terrorism. That coercive impact—achieved by Defendants' amplification and mobilization—defines "international terrorism" under the ATA. Baroud, AMP's Digital Media Associate, played a vital role in this amplification effort in the digital age.

## **LEGAL STANDARD**

A complaint survives a motion to dismiss under Fed. R. Civ. P. 12(b)(6) if it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plausibility standard "is not akin to a 'probability requirement,'" but simply requires "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. While "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" are insufficient, *id.*, a complaint need only plead enough facts to allow the court to draw the reasonable inference that the defendant is liable.

The Eleventh Circuit applies a two-step approach: courts first disregard allegations that are merely legal conclusions and then assume the truth of all well-pleaded factual allegations to determine whether they plausibly give rise to an entitlement to relief. *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (citing *Iqbal*, 556 U.S. at 679). At this stage, courts accept the factual allegations in the complaint as true and construe them in the light most favorable

to plaintiffs. *Brooks v. Powell*, 800 F.3d 1295, 1300 (11th Cir. 2015). Allegations must also be assessed collectively, not parsed in isolation. *Tellabs,* 551 U.S. at 322–23.

## ARGUMENT

### I.    The FAC Plausibly Alleges That Defendant Baroud Herself Committed Acts of International Terrorism

Plaintiffs sue Defendant over her integral role in transforming Hamas's October 7 atrocities into terrorism within the meaning of the ATA. The violence may have been carried out by Hamas, but the October 7 Attacks would not have constituted terrorism without the conduct of Baroud and all of the Defendants.

The ATA provides a civil remedy to "[a]ny National of the US injured…by reason of an act of international terrorism." 18 USC. § 2333(a). Congress defined "international terrorism" broadly. 18 USC. § 2331(1). Liability attaches not only to those who physically commit murder, bombings, or kidnappings, but also to conduct that "involve[s] violent acts or acts dangerous to human life" and is intended to intimidate or coerce. § 2331(1)(A)–(B). The Supreme Court has explained that even non-violent activities coordinated with an FTO are inseparable from its violent acts. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 26–27 (2010).

Terrorism is not defined solely by atrocities on the battlefield; it is equally defined by the exploitation of those atrocities to achieve political goals. The October 7 Attacks were designed to terrorize Americans, Israelis, and Jews worldwide, coerce Israel, and shape international opinion. That transformation from atrocity into terrorism required networks, infrastructure, propaganda, and mobilization, all of which Baroud helped provide. Without these networks,

October 7 might have been a bloody crime. With them, it became effective terrorism, achieving the coercive impact Congress intended the ATA to remedy. That coordination is not incidental. It was foreseeable and deliberate.

The FAC pleads that since at least 2019, Baroud has served as AMP's Digital Media Associate, overseeing its social media operations and assisting NSJP in producing and disseminating propaganda (FAC ¶¶ 55, 158). The FAC further alleges that, immediately following October 7, NSJP disseminated its "Day of Resistance" toolkit, which called for coordinated campus mobilizations, glorified Hamas's atrocities as legitimate "resistance," and declared that NSJP was part of the same movement as Hamas (FAC ¶¶ 278-96). Hamas itself publicly acknowledged, approved, and thanked SJP and NSJP for their support, confirming that these campaigns were not independent student activity but recognized by Hamas as advancing its program of intimidation and coercion (FAC ¶¶ 374-79). Nor was Baroud's conduct confined to the days after October 7. The FAC details years of coordinated messaging and mobilization in which she participated as social media coordinator, embedding Hamas's narrative across SJP chapters nationwide, fostering campus environments of harassment and intimidation of Jewish students, and normalizing Hamas's terrorism (FAC ¶¶ 224-70). It pleads that these efforts continued after October 7 through intimidation campaigns that amplified Hamas's atrocities and magnified their coercive impact on U.S. campuses (FAC ¶¶ 343–73). In this way, Baroud's role was not episodic but part of a sustained campaign before, during, and after October 7 to transform Hamas's violence into effective terrorism.

Defendant's reliance on *Chiquita Brands*, *Stansell*, *Kaplan*, and *Newman* is misplaced. Those cases address neutral or routine conduct; here the FAC alleges insider propaganda work within Hamas's U.S. infrastructure. That is more than sufficient. Furthermore, Defendant's name-count argument fails. The Court reads the FAC as a whole. The allegations plausibly state her personal participation.

Nor can Defendant escape liability by asserting that the FAC pleads no scienter. The complaint alleges she coordinated with NSJP, an organization that explicitly declared itself "part of [the] movement" that includes Hamas (FAC ¶¶ 170, 199, 201–05, 220). Doing so as an employee of an AMP, successor to IAP/HLF already adjudicated Hamas fronts (*Boim* 549 F.3d at 698–702), further makes her awareness plausible. Courts have long held that providing propaganda and services in coordination with an FTO suffices to establish intent. *U.S. v. Suarez*, 893 F.3d 1330 (11th Cir. 2018). That she lived with her father, Ramzy Baroud, whose organizations were tied to Hamas operatives, further bolsters the plausibility of her awareness (FAC ¶ 55). Defendant's request to strike those allegations under Rule 12(f) should be denied, as they are probative of her knowledge and intent and not immaterial or scandalous. *Garcia v. Chapman,* 911 F. Supp. 2d 1222 (SD Fla 2012*)*. Plaintiffs do not seek to hold Baroud liable for her family ties. Rather, her proximity to Hamas-linked organizations is probative of her knowledge and intent and properly considered alongside her own role at AMP. *Manhart* is inapposite given defendant-specific propaganda allegations here, with references to her father's affiliations probative context for scienter.

Finally, Defendant argues Plaintiffs fail to plead proximate cause. But proximate cause under the ATA can be satisfied in two ways: a "direct relationship" between the injuries suffered and the defendant's acts or by showing that the defendant's conduct was a "substantial factor" in the sequence of events and that the resulting harm was foreseeable. *Newman* 758 F. Supp. 3d at 1380; *Colon v. Twitter, Inc.*, 14 F.4th 1213, 1223 (11th Cir. 2021). The FAC pleads both. It alleges a direct relationship between Baroud's propaganda work in coordination with Hamas's U.S. arm and the intimidation, harassment, and campus mobilizations that amplified the October 7 Attacks into terrorism. And it alleges that her propaganda was a substantial factor in ensuring Hamas's atrocities had their intended coercive effect by magnifying their impact on campuses, intimidating Jewish students, and mobilizing Hamas's support base in the U.S. (FAC ¶¶ 224-70, 278-96, 374-79). These consequences were not only foreseeable; they were the very objectives of her coordinated campaign. Unlike cases such as *Owens v. BNP Paribas S.A.*, 897 F.3d 266 (D.C. Cir. 2018), which involved attenuated financial services, Baroud's conduct was intimately connected to the October 7 Attacks and their effectiveness as terrorism. The more detailed connection between Baroud's role as AMP's digital media associate and NSJP/SJP's coordination with Hamas's campaign of intimidation will be borne out in discovery.

Baroud wasn't a neutral observer but an active participant who ensured Hamas's violence resonated as terrorism. The ATA doesn't limit liability to those wielding the weapons. Those who publicize, justify, and mobilize in coordination with terrorism commit acts that "***involve*** violent acts" under § 2331(1) (emphasis

added). Such promoters help accomplish the "intimidat[ion] or coerc[ion] of a civilian population," and "influenc[ing] the policy of a government by intimidation or coercion." 18 U.S.C. § 2331(1)(B)(i) and (ii). Plaintiffs' allegations plausibly state claims that Defendant herself committed acts of international terrorism.

## II.   Plaintiffs Plausibly Allege Aiding-and-Abetting Liability as to Baroud

The ATA imposes liability on any person who "aids and abets, by knowingly providing substantial assistance" to acts of international terrorism. 18 U.S.C. § 2333(d)(2). The statute, as amended, requires that courts evaluate such claims under the framework established in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), as adopted by the Supreme Court in *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023). To state a claim, Plaintiffs must allege (1) a principal committed an act of international terrorism, (2) the defendant was generally aware of her role in an unlawful enterprise from which terrorist acts were foreseeable, and (3) the defendant knowingly and substantially assisted the principal. *Taamneh*, 598 U.S. at 495–97. Courts then assess substantial assistance by reference to the six *Halberstam* factors.

The FAC pleads all three elements as to Baroud. First, Hamas, a designated FTO, committed the October 7 Attacks and subsequent acts of international terrorism that injured Plaintiffs. Second, Baroud was generally aware of her role in Hamas's U.S.-based support network; such awareness does not require knowledge of the specific October 7 Attacks and its aftermath, only recognition of participation in an enterprise where terrorist violence is a foreseeable outgrowth. *Halberstam*, 705

F.2d at 472; *Taamneh*, 598 U.S. at 495. Plaintiffs allege AMP was formed as the successor to Hamas's dismantled U.S. mobilization fronts (IAP/AMS/HLF), and its leaders then founded NSJP in 2010 as the umbrella coordinating 200+ SJP chapters to carry forward the Palestine Committee's university-infiltration strategy (FAC ¶¶ 114-21, 126-9, 131, 144-153, 194, 406-07). Within that infrastructure, Baroud served as AMP's Digital Media Associate, produced propaganda for SJP chapters, oversaw AMP's social media since at least 2019, and assisted NSJP's social media, embedding Hamas's messaging across the nationwide student network and driving NSJP's expansion (FAC ¶¶ 55, 158, 224-70). The FAC also pleads she resides with her father, Ramzy Baroud—affiliated with CIGA and *The Palestine Chronicle*, which the FAC links to a Hamas operative—allegations offered as circumstantial evidence of her awareness while directing AMP's propaganda arm, not for vicarious liability (FAC ¶ 55). The FAC plausibly alleges awareness.

Third, Baroud knowingly and substantially assisted Hamas's enterprise. Like the *Halberstam* bookkeeper, Baroud sustained Hamas's propaganda network without being present at the attacks. That suffices for "knowing and substantial assistance." AMP's successor formation and Hamas ties (FAC ¶¶ 114-22, 126-29), its creation of NSJP to institutionalize Hamas's ideology across more than 200 campuses (FAC ¶¶ 144-53, 194, 224-70), NSJP's "Day of Resistance Toolkit" directing glorification of the atrocities (FAC ¶¶ 278-96), and SJP chapters' ensuing harassment of Jewish students, praise of "martyrs," and encampments that Hamas itself praised (FAC ¶¶ 298–379) are pleaded overt acts within the very channel

Baroud managed; her digital production and amplification were the mechanism by which that infrastructure functioned.

Applying the *Halberstam* factors confirms the claim. The nature of the act assisted—terrorist mass murder—is exceptionally grave; the amount and quality of assistance—sustained, coordinated digital propaganda that projected and legitimized Hamas's violence in the U.S.—were substantial. Physical presence in Israel is irrelevant; the point is that Baroud's role within AMP ensured October 7 and its aftermath resonated here as terrorism. Her relationship to the tortfeasor is direct given AMP's succession to prior Hamas fronts and her role running AMP's propaganda that NSJP and SJP chapters deployed. Her state of mind is plausibly alleged through her organizational role and context, and the duration of her assistance spanning years was ongoing. That is more than sufficient under *Halberstam*.

Defendants lean heavily on *Parizer v. AJP Educ. Found., Inc.*, 2025 WL 2382933 (E.D. Va. Aug. 15, 2025), but that case underscores why dismissal is unwarranted here. *Parizer* considered only an aiding-and-abetting theory and dismissed because the plaintiffs, all of whom were injured on October 7, relied almost exclusively on post-attack propaganda to connect defendants' conduct to their injuries. This case is fundamentally different in two respects.

First, Plaintiffs do not rely solely on aiding-and-abetting. The complaint asserts direct liability under § 2333(a), conspiracy under JASTA, and material-support liability under § 2339B. These claims rest on allegations that Defendants themselves committed acts of "international terrorism" within the meaning of

§ 2331(1) by producing and disseminating Hamas propaganda, coordinating campus mobilizations, and sustaining Hamas's U.S. infrastructure. The terrorism that harmed Plaintiffs was not confined to Israel's borders. It became terrorism because Defendants gave it reach and coercive power, ensuring Hamas's atrocities were amplified and received as intimidation and coercion against civilians and governments.

Second, unlike *Parizer*, this case involves Plaintiffs harmed both on and after October 7. The October 7 Plaintiffs plausibly allege direct liability, as well as aiding and abetting, conspiracy, and material support, because Defendants' propaganda and mobilization apparatus, for years before, on, and after October 7, gave Hamas's atrocities their coercive impact, transforming mass murder into terrorism within a global campaign of intimidation. Plaintiffs injured after October 7 plausibly allege all four theories because Defendants' post-attack conduct, including dissemination of NSJP's "Day of Resistance" toolkit and coordination of campus mobilizations, directly furthered Hamas's continuing terrorism, including rocket fire, hostage-taking, intimidation of Jews worldwide, and campaigns aimed at coercing governments and international institutions.

That *Parizer* itself granted leave to amend is telling; the court recognized that more particularized allegations could sustain liability. Plaintiffs here go further, alleging direct liability, conspiracy, and material-support claims, and tying both October 7 Plaintiffs and post-October 7 Plaintiffs to their injuries.

These distinctions are dispositive. Where *Parizer* dismissed a narrow aiding-and-abetting theory for want of a nexus, Plaintiffs here allege Defendants

-14-

themselves committed acts of international terrorism and that their post-attack
conduct substantially furthered Hamas's campaign against both October 7 Plaintiffs
and post-October 7 Plaintiffs. Far from foreclosing these claims, *Parizer* confirms
why dismissal is unwarranted.

### III.    The FAC Plausibly Alleges Conspiracy

ATA § 2333(d)(2) imposes secondary liability on "any person who conspires
with the person who committed" an act of international terrorism. To plead such a
claim, Plaintiffs need only allege facts that, taken as true, make an agreement—
formal or informal—plausible, plus an overt act in furtherance and resulting injury.
*Halberstam* 705 F.2d at 477; *Bell Atl. Corp.* 550 U.S. at 556–57. The Eleventh Circuit
has held that an agreement may be proved by circumstantial evidence, such as
inferences from the conduct of the alleged participants or from circumstantial
evidence of a scheme. Proof is not required that the defendant had knowledge of
all the details of the conspiracy; the defendant need only have knowledge of the
essential objective of the conspiracy. *U.S. v. Tamargo,* 672 F2d 887 (11th Cir 1982*).*

The FAC does exactly that as to Baroud: it alleges she "serves as the Digital
Media Associate of AMP, producing propaganda for SJP chapters," has "been
overseeing AMP's social media activity since at least 2019," and "assists NSJP with
its social media activity"—i.e., she creates and pushes the messaging NSJP and SJP
chapters deploy on U.S. campuses in furtherance of the common plan (FAC ¶¶ 55,
158). The FAC also reinforces her awareness by alleging she resides with her father,
Ramzy Baroud, affiliated with CIGA and *The Palestine Chronic*le, which the FAC

links to a Hamas operative, further supporting that her propaganda work was undertaken with knowledge of Hamas's aims (FAC ¶ 55).

That inference is further strengthened by AMP's well-documented lineage as the alter ego and successor of IAP/AMS and HLF, which were adjudicated in *Boim* 549 F.3d at 698–702, to be integral components of Hamas's U.S. support network and liable under the ATA. The *Boim* court held that when a defendant knowingly provides material support to such an entity, it is "as a matter of law…international terrorism" because the support inevitably furthers the group's violent ends. *Id.* at 693–94. AMP's continuation of IAP/AMS/HLF's mission situates Baroud's propaganda role within a conspiracy already judicially tied to Hamas, making it plausible she acted with knowledge of the conspiracy's essential objective. As *Holder* underscores, support for a designated group's "social" or "advocacy" activities inevitably advances the organization as a whole—including its violent ends—because such support is fungible and legitimizing. *Holder,* 561 U.S. at 30–39.

The "agreement" element is plausibly pled through the infrastructure and mission the FAC describes and into which Baroud's role fits. NSJP was founded in 2010 by leaders of AMP and USPCN, functions as the umbrella for more than 200 SJP campus chapters, and was built to propagate the Palestine Committee's—and Hamas's—strategy in U.S. universities. The conspiracy's blueprint reaches back to the 1993 Philadelphia meeting of Hamas's Palestine Committee, where leaders discussed "infiltrat[ing] universities" and developing youth curricula to ensure a "next generation" hostile to peace; the FAC ties those objectives forward to the creation and operation of NSJP and the SJP chapter network (FAC ¶¶ 131, 144–

50, 194, 406-07). NSJP's own self-description—identifying itself as "the student movement," declaring it is "PART of this movement" that includes Hamas, and "join[ing] the call for mass mobilization"—confirms unity of purpose with Hamas (FAC ¶¶ 170, 199, 201-05, 220, 278–96, 301, 309, 321, 325, 393, 409). That is the very hub whose messaging and materials Baroud is alleged to produce and amplify.

*Freeman*, *Newman,* and *Bernhardt* involved independent, profit-seeking or neutral objectives; here the shared object is intimidation/coercion aligned with Hamas. *See Freeman v. HSBC Holdings PLC*, 57 F.4th 66, 80 (2d Cir. 2023); *Newman* 758 F. Supp. 3d at 1374; *Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856 (D.C. Circ. 2022). The FAC pleads that NSJP was designed and operated as Hamas's U.S. student arm; that it publicly cast itself as part of a movement that includes Hamas; and that Baroud's job was to produce and propagate the messaging NSJP/SJP deployed to mobilize, radicalize, and intimidate on campuses. That conduct aligned with Hamas's coercive program well before, during, and after October 7. Under *Halberstam*, it is enough that she joined in the shared objective of advancing Hamas's program of intimidation and coercion that culminated in and was amplified by the October 7 Attacks. See *Halberstam* 705 F.2d at 486–87. Baroud produced and disseminated propaganda that framed Hamas's October 7 atrocities as legitimate "resistance," presented them as part of a global movement, and magnified their coercive effect on U.S. campuses. By agreeing to generate and spread that messaging in her capacity as AMP's digital media associate, Baroud ensured that the October 7 Attacks were experienced and understood as "terrorism"—acts intended to intimidate and coerce civilians—both in the U.S. and

abroad. That is a pleaded "unity of purpose," not parallel conduct. *Freeman*, 57 F.4th at 80; *Newman*, 758 F. Supp. 3d at 1374.

This is not a conclusory allegation of agreement. The FAC pleads who formed NSJP (AMP and USPCN leaders), when (2010), for what function (national hub coordinating 200+ SJP chapters), why (to carry forward the Palestine Committee's university-infiltration strategy), and how Baroud fits (AMP's digital media associate producing propaganda for SJP chapters and assisting NSJP social media)—allegations that, accepted as true, "suggest that an agreement was made."

The FAC also pleads overt acts and related injury. It alleges the conspiracy's U.S. expression was to embed Hamas's messaging over several years across campuses, mobilize students, and generate intimidation and coercion—the "coercive effects" that define international terrorism under the ATA—and it details the post-October 7 escalation under NSJP's banner, including the "Day of Resistance" toolkit and coordinated campus actions (FAC ¶¶ 224-96, 374-79). Coupled with NSJP's self-identification as part of "our movement" with Hamas and with Baroud's defined role producing and amplifying the content used by SJP/NSJP, those are overt acts "in furtherance of the common scheme." *Halberstam*, 705 F.2d at 477 (FAC ¶¶ 55, 158, 131, 150, 194, 406-07, 224-70, 278-96, 374-79); see 18 U.S.C. § 2331(1)(B) (coercive effects).

## IV.    The FAC Plausibly Alleges Material Support in Violation of the ATA

ATA § 2333(a) provides a civil remedy to "[a]ny national of the U.S. injured…by reason of an act of international terrorism." 18 U.S.C. § 2333(a). That

requirement is satisfied where a defendant violates § 2339B by "knowingly provid[ing] material support or resources to a foreign terrorist organization." § 2339B(a)(1). "Material support" includes "any service [or] personnel." §2339A(b)(1).

The FAC alleges that Baroud, as AMP's Digital Media Associate, provided exactly this kind of "service" and "personnel." She oversaw AMP's social media, assisted NSJP in producing and amplifying Hamas-aligned propaganda, and coordinated online campaigns that glorified the October 7 atrocities as "resistance" (FAC ¶¶ 55, 158, 224–70, 278–96, 374–79). These allegations describe not abstract advocacy but provision of services to Hamas's U.S. student arm, in direct coordination with a designated FTO. Courts have held that propaganda, recruitment, and operational assistance constitute "material support." *See U.S. v. Suarez*, 893 F.3d 1330 (11th Cir. 2018) (propaganda and coordination with ISIS members supported conviction under § 2339B); *Boim* 549 F.3d at 698–702 (fundraising and support to Hamas intermediaries actionable under the ATA).

Nor is scienter lacking. Section 2339B requires only that a defendant know the organization is a designated FTO or engages in terrorism, not that she intend a specific attack. The FAC alleges Baroud provided propaganda services in coordination with NSJP, which openly declared itself "part of [the] movement" that includes Hamas (FAC ¶¶ 170, 199, 201-05, 220). It further pleads that she did so as an employee of AMP, the acknowledged offshoot of IAP and HLF—entities adjudicated to be Hamas enterprises in *Boim*. These facts more than plausibly allege knowledge that her services supported Hamas.

Finally, proximate cause is satisfied under either articulation recognized in ATA cases. There is a direct relationship between Baroud's propaganda work and the intimidation, harassment, and coercive mobilizations that amplified the October 7 Attacks. At minimum, her conduct was a substantial factor in ensuring Hamas's atrocities achieved their intended coercive effect, and the resulting harms were foreseeable. *See Colon* 14 F.4th at 1223; *Owens* 897 F.3d at 273.

Plaintiffs need not trace every operational step between Baroud's conduct and the October 7 Attacks. It is enough that the FAC plausibly alleges she knowingly provided "services" and "personnel" in coordination with Hamas's U.S. student infrastructure, materially supporting its campaign of intimidation and coercion. That is precisely what § 2339B forbids.

## V.    Plaintiffs' Claims Target Unprotected Conduct, Not Protected Speech

Defendant reframes this as silencing political expression. No so. Plaintiffs target coordinated provision of services to Hamas's U.S. infrastructure. The "knowing provision of material support to a foreign terrorist organization" is not protected, even when expressed as coordinated messaging. *Holder* 561 U.S. at 26–27, 39. *See also U.S. v. Jayyousi*, 657 F.3d 1085, 1102–03 (11th Cir. 2011); *U.S. v. Mehanna*, 735 F.3d 32, 45 (1st Cir. 2013). *Snyder* and *Claiborne* involved independent advocacy, unlike the coordinated propaganda alleged here. Plaintiffs are not trying to punish dissent. They are seeking accountability for Baroud's knowing contribution to Hamas's propaganda network, the very machinery that turned October 7 from a set of atrocities into effective terrorism.

## CONCLUSION

For the foregoing reasons, Moving Defendant's motion should be denied in

its entirety, and permit Plaintiffs to proceed with their claims under the ATA.

Dated:  Brooklyn, New York
       September 26, 2025

                         Yours,

                         THE BERKMAN LAW OFFICE, LLC
                         *Attorneys for Plaintiffs*

                         by:    /s/ Robert J. Tolchin_____
                               Robert J. Tolchin

                         829 East 15th Street, Box 7
                         Brooklyn, New York 11230
                         718-855-3627

Of Counsel:

NITSANA DARSHAN-LEITNER & CO.
Nitsana Darshan-Leitner, *Israeli Attorney for Plaintiffs*
10 Hata'as Street
Ramat Gan, 52512 Israel
Israeli #: 011-972-523-837-020 | U.S.: (212) 591-0073

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this Motion filed through the ECF system is expected to be sent electronically to the registered participants as identified on the court's docket.

/s/Robert J. Tolchin

Robert J. Tolchin