# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

-----------------------------------------------------------------------X

MAURICE SHNAIDER, *et al.*,

                Plaintiffs

         v.

AMERICAN MUSLIMS FOR PALESTINE, *et al.*

              Defendants.

Case No:
8:24-cv-01067-MSS-SPF

-----------------------------------------------------------------------X

## PLAINTIFFS' OPPOSITION TO DEFENDANT CODEPINK'S MOTION TO DISMISS

Defendant CodePink moves to dismiss under Rules 12(b)(1) and 12(b)(6), asserting lack of Article III standing and failure to state a claim. The First Amended Complaint ("FAC") pleads defendant-specific facts tying CodePink to Hamas's U.S. support network and to Defendant National Student for Justice in Palestine ("NSJP"), coordinated operations, shared office space and personnel, recruitment of "Palestine work" interns, repeated engagements with Hamas officials in Gaza, and CodePink-organized or endorsed violent events, and asserts claims for direct liability, conspiracy, aiding and abetting, and material support. Taken as true, these allegations establish Article III standing and plausibly plead CodePink's knowing participation in, and substantial assistance to, Hamas's terrorist enterprise.

# INTRODUCTION

Plaintiffs, survivors and family members of victims of the October 7, 2023 Hamas terrorist attacks and their aftermath (the "October 7 Attacks"), bring this action under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(a) and (d), to hold CodePink liable for knowingly aiding and abetting Hamas, providing it with material support, and conspiring in furtherance of acts of international terrorism.

The Court should deny Defendant CodePink's Motion. The FAC must be read as a whole. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). Read holistically, the FAC plausibly alleges that CodePink, acting through and alongside NSJP and SJP chapters, helped establish and sustain U.S. infrastructure that materially supported Hamas, a designated Foreign Terrorist Organization ("FTO"). The FAC pleads with specificity that CodePink coordinated with NSJP, shared office space and personnel, recruited interns for Hamas-aligned "Palestine work," publicly endorsed and engaged with terrorists, and organized and endorsed large-scale mobilizations where Hamas slogans and symbols were displayed and violence erupted, and met directly with Hamas officials in Gaza who pledged protection, and entrusted CodePink's founder with a letter intended for delivery to President Barack Obama as part of Hamas's effort to influence U.S. policy through terrorism. (FAC ¶¶ 207-10, 382, 386)

CodePink attempts to recast this case as an effort to "denigrate political advocacy," cloaking its conduct in rhetoric about "human rights abuses," "genocide," and historical grievances. Those arguments are irrelevant to the Rule 12(b)(6) analysis and have nothing to do with Plaintiffs' claims or their injuries from

the October 7 Attacks. Op-eds and reports from United Nations bodies or international commentators cannot substitute for the factual allegations in the FAC, which detail CodePink's own conduct in furthering Hamas's U.S. enterprise. Plaintiffs are survivors and family members of victims of the October 7 Attacks. This lawsuit is about dismantling a network of coordination with terrorist groups. This case is not about CodePink's abstract views on Israel or Gaza; it is about CodePink's know role in Hamas's support structure in the U.S., providing services, personnel, and resources that aided and abetted Hamas's campaign of terrorism.

CodePink's reliance on sweeping, unverified, disputed, and irrelevant casualty statistics, UN reports, and political accusations of "genocide" is immaterial to the issues before this Court. Such inflammatory rhetoric has no bearing on whether Plaintiffs have plausibly alleged ATA claims. It serves only to prejudice and distract. Plaintiffs respectfully submit that the Court should disregard or strike these portions of CodePink's Motion as irrelevant to Rule 12(b)(6). See Fed. R. Civ. P. 12(f) (permitting the Court to strike "any redundant, immaterial, impertinent, or scandalous matter").

Crucially, the FAC alleges conduct both before and after October 7. Before the attacks, CodePink and its co-defendants built and sustained the infrastructure that Hamas relied upon to ensure its campaign of violence would resonate beyond Israel's borders. After the attacks, CodePink used that same infrastructure to amplify, justify, and mobilize around Hamas's atrocities, turning a local massacre into global terrorism that achieved its intended coercive effect of intimidating civilians and influencing governments. If a terrorist bomb goes off in the forest and

nobody hears it, it isn't terrorism. October 7 became terrorism because Defendants supplied the machinery that made Hamas's violence echo worldwide.

## **FACTUAL BACKGROUND**

CodePink mischaracterizes the factual allegations in the FAC. Plaintiffs do not rely on "piecemeal" or "conclusory" assertions, but plead detailed, defendant-specific facts establishing CodePink's integral role in Hamas's U.S. support network and its collaboration with NSJP and SJP chapters. The FAC alleges that CodePink repeatedly engaged with Hamas officials in Gaza, accepted and carried Hamas's propaganda for delivery to the President of the United States, endorsed terrorist leaders, coordinated resources with NSJP, and organized violent rallies where demonstrators shouted genocidal chants supporting Hamas and engaged in confrontations requiring law enforcement intervention (FAC ¶¶ 189, 207-210, 382, 386). These allegations, when read together with the broader network pleaded in the FAC, state claims for direct liability, conspiracy, aiding and abetting, and material support.

First, CodePink complains that Plaintiffs allege it was tied to Hamas officials and other terrorist actors without "substantiation." But the FAC specifically pleads that CodePink's leadership traveled to Gaza, where they were welcomed by Hamas, given safety assurances by Hamas officials, and entrusted with a letter to deliver to President Obama (FAC ¶ 210). Whether additional details of these interactions emerge in discovery does not undercut the plausibility of the allegations at the pleading stage. See *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007) (courts must assess allegations collectively). Publicly

available sources already confirm the FAC's allegations, including CodePink's own press releases announcing trips to meet Hamas officials and contemporaneous reporting of Hamas's letter to the U.S. President. These are not vague allegations but concrete facts showing CodePink's engagement with Hamas.

Second, CodePink minimizes the allegations about its close coordination with NSJP. This case is fundamentally about Hamas's student arm in the U.S., and the FAC pleads that CodePink worked hand in glove with NSJP—sharing office space, recruiting interns for "Palestine work" tied to the Hamas-affiliated BDS National Committee, and training students in disruptive tactics (FAC ¶¶ 207-09). The conspiracy alleged in the FAC traces back to the 1993 Philadelphia meeting of the Hamas-affiliated Palestine Committee, where Hamas leaders in the U.S. strategized to oppose the Oslo Accords by mobilizing youth, infiltrating universities, and cultivating a student movement to advance Hamas's agenda (FAC ¶¶ 144-45). That strategy came to fruition in 2010 when NSJP was launched at the U.S. Social Forum. The FAC pleads that CodePink was instrumental in sponsoring and supporting that conference, providing the platform through which Hamas's long-planned student arm took organizational form in the U.S. (FAC ¶ 189). In this way, CodePink was not peripheral; it played a critical role in carrying forward the Hamas-directed strategy conceived at Philadelphia and embedding it in American universities. CodePink's effort to reframe this as "political advocacy" ignores the FAC's concrete allegations of operational collaboration with an entity established to act as Hamas's youth arm.

Third, CodePink dismisses its own several trips to Gaza. But those trips

matter because they involved direct coordination with Hamas officials and the transmission of Hamas's messaging to U.S. leaders (FAC ¶ 210). That conduct is consistent with the FAC's broader allegations that CodePink functioned as part of Hamas's international support network, transmitting propaganda and legitimizing Hamas through direct engagement.

Fourth, CodePink seeks to minimize its sponsorship of the "Palestine Program" at the 2010 U.S. Social Forum (FAC ¶ 189). Yet that forum was the launching point for NSJP as Hamas's organized student arm in the U.S. CodePink's role in sponsoring and promoting the forum placed it squarely at the inception of the Hamas-affiliated student movement that continues to this day. The FAC traces that conspiracy back to the 1993 Philadelphia meeting (FAC ¶¶ 144-145). By sponsoring and facilitating the Social Forum where NSJP was organized, CodePink carried forward that strategy and embedded Hamas's student movement into American universities.

Fifth, CodePink attempts to distance itself from the June 2024 events, but the FAC pleads with specificity that CodePink organized and endorsed both the Los Angeles synagogue violent demonstration and the White House mobilization (FAC ¶¶ 382, 386). At those events, agitators waved Hamas banners, chanted "Al Qassam make us proud, kill another soldier now," proclaimed "intifada revolution," and attempted to scale the White House fence while wearing Hamas headbands. Law enforcement, including the Secret Service and Capitol Police, were forced to intervene with tear gas (FAC ¶¶ 382). CodePink cannot insulate itself by pretending those actions were "unattributed" to it. By organizing,

endorsing, and failing to repudiate these Hamas-supporting demonstrations, CodePink assumed responsibility for their foreseeable results. See *Halberstam v. Welch*, 705 F.2d 472, 484-85 (D.C. Cir. 1983) (foreseeability and the nature of assistance are central to aiding-and-abetting liability).

CodePink's "shotgun pleading" charge fails. Courts reject that label where the complaint provides defendant-specific allegations while also pleading the broader conspiracy. See *Merino v. Ethicon Inc.*, 536 F. Supp. 3d 1271, 1278 (S.D. Fla. 2021); *Restless Media GmbH v. Johnson*, 704 F. Supp. 3d 1288, 1293 (S.D. Fla. 2023). This case is readily distinguishable from *Magluta v. Samples*, 256 F.3d 1282 (11th Cir. 2001), which involved indiscriminate pleading against dozens of defendants without differentiation. Here, the FAC specifically distinguishes among the Defendants and details the roles each played in the conspiracy. Each Defendant's motion to dismiss attempts a game of "not it." But the FAC makes clear that all Defendants participated: that is the nature of a terrorism conspiracy. Each Defendant's conduct—whether CodePink's trips to Gaza and sponsorship of the Social Forum to help establish the student arm of Hamas, USPCN's and AMP's succession of adjudicated Hamas fronts, or the leadership roles of individual conspirators—functioned as part of an integrated structure. The FAC pleads CodePink's role with specificity—its coordination with NSJP, recruitment of Hamas-aligned interns, engagement with Hamas officials, and organization of Hamas-supporting rallies (FAC ¶¶ 2, 7-8, 51, 98, 189, 207-10, 382, 386, 406-07). That coordinated structure is the essence of terrorism: each actor plays a part in ensuring that Hamas's violence resonates globally.

At the pleading stage, Plaintiffs are not required to prove every detail or establish evidentiary substantiation. They must plausibly allege that CodePink conspired with, aided and abetted, and provided material support to Hamas. The FAC more than meets that standard.

### STANDARDS OF REVIEW

**A. Rule 12(b)(1) - Article III Standing**

Article III requires only a plausible showing that Plaintiffs' injuries are fairly traceable to Defendant's conduct; it does not require the Defendant to be the sole or immediate cause. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); see also *Attias v. CareFirst, Inc.*, 865 F.3d 620 (2017).

**B. Rule 12(b)(6) - Plausibility**

A complaint survives a motion to dismiss under Fed. R. Civ. P. 12(b)(6) if it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plausibility standard "is not akin to a 'probability requirement,'" but simply requires "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. While "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" are insufficient, *id.*, a complaint need only plead enough facts to allow the court to draw the reasonable inference that the defendant is liable. At this stage, courts accept the factual allegations in the complaint as true and construe them in the light most favorable to plaintiffs. *Brooks v. Powell*, 800 F.3d 1295, 1300 (11th Cir. 2015). Allegations are assessed collectively, not in isolation. *Tellabs,* 551 U.S. at 322-23.

## ARGUMENT

### I. Plaintiffs Plausibly Allege Article III Standing

CodePink argues Plaintiffs' injuries are not traceable to its conduct, but that misstates Article III and how ATA liability works. At the pleading stage, Plaintiffs need only allege a plausible causal connection, not that CodePink personally directed Hamas fighters on October 7. *In re Chiquita Brands Int'l, Inc., 284 F. Supp. 3d 1284* (2018). In terrorism cases, traceability is satisfied where a defendant's support was a substantial factor in the sequence of events and the resulting harm was foreseeable. *Owens v. BNP Paribas S.A.*, 897 F.3d 266, 273 (D.C. Cir. 2018); *Boim v. Holy Land Found.*, 549 F.3d 685, 693-94 (7th Cir. 2008) (en banc). Courts have likewise recognized that conspiratorial participation in a coordinated support network satisfies traceability under the ATA. *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 218-19 (D.C. Cir. 2022).

The FAC pleads exactly that. It alleges with specificity that CodePink coordinated with NSJP, shared office space and personnel, sponsored the 2010 Social Forum "Palestine Program" that launched NSJP, and jointly organized events and mobilizations that projected Hamas's terrorist messaging into the U.S. (FAC ¶¶ 98, 150, 189, 207-210, 382, 386, 406-407). These allegations tie CodePink directly into the same Hamas-directed network as NSJP, the student arm of Hamas that spearheaded Hamas's propaganda and mobilization before, during, and after October 7.

The FAC details how SJP chapters systematically advanced Hamas's agenda on U.S. campuses for years leading up to the October 7 Attacks—harassing Jewish students, glorifying "martyrs," and normalizing Hamas rhetoric such as "intifada"

and "from the river to the sea" (FAC ¶¶ 224-70). Two days before the attacks, Columbia SJP suddenly reactivated with the post "We are back!!" (FAC ¶ 297). Immediately afterward, NSJP issued its "Day of Resistance Toolkit," directing chapters to glorify the massacres and mobilize in Hamas's defense (FAC ¶¶ 278-96). Mobilizations and encampments followed nationwide, where chants praised Hamas's Al-Qassam Brigades and called for further violence (FAC ¶¶ 380-86). Hamas itself praised and encouraged these student activities (FAC ¶¶ 374-79). These activities were a substantial factor in Hamas's campaign because the coercive impact of terrorist violence depends not only on the violence itself, but on its amplification through propaganda, mobilization, and networks of support deliberately constructed over years. See *Owens v. BNP Paribas S.A.*, 897 F.3d at 273. CodePink's coordination with NSJP therefore places it squarely inside the same operational network that transformed October 7 from a localized massacre into global terrorism with coercive effect.

CodePink's argument that its conduct was "too early" (2009 Gaza trips, 2010 Social Forum) or "too late" (June 2024 rallies) misunderstands both Article III and ATA liability. The FAC pleads a continuous course of conduct that built Hamas's U.S. infrastructure before October 7 and then amplified its campaign afterward. Courts have long recognized that pre-attack support that strengthens a terrorist organization's capabilities is traceable to later attacks, and that post-attack conduct that sustains the campaign remains actionable. *Boim v. Holy Land Found.*, 549 F.3d 685, 693-94 (7th Cir. 2008) (en banc); *Owens*, 897 F.3d at 275-76.

Furthermore, Plaintiffs can recover for injuries sustained in Hamas attacks

after October 7. The ATA imposes liability for injuries suffered "by reason of" acts of international terrorism "committed, planned, or authorized" by the FTO the defendant aided, abetted, or conspired with. 18 U.S.C. § 2333(a), (d). Plaintiffs allege that each of the post-October 7 attacks identified in the FAC was carried out by Hamas or as part of Hamas's coordinated campaign, and that such attacks were foreseeable consequences of the infrastructure CodePink helped to establish. Courts have repeatedly held that ATA liability extends to subsequent terrorist acts carried out within an FTO's broader campaign. *Owens*, 897 F.3d at 275-76; *Stansell v. BGP, Inc.*, 2011 WL 1296881, at *6 (M.D. Fla. Mar. 31, 2011).

October 7 itself was inseparable from CodePink's role: the violence became terrorism only because it was amplified, legitimized, and mobilized through the networks all of the Defendants built. By ensuring Hamas's atrocities were reinforced and disseminated through these structures, CodePink's conduct not only secured the coercive success of October 7 but also helped precipitate the subsequent campaign of violence. Plaintiffs injured on October 7 and Plaintiffs injured in the aftermath thus both have standing.

## II.    The FAC Plausibly Alleges That Defendant CodePink Itself Committed Acts of International Terrorism

Plaintiffs sue Defendant over its integral role in transforming Hamas's October 7 atrocities into terrorism within the meaning of the ATA. The violence may have been carried out by Hamas, but the October 7 Attacks would not have constituted terrorism without the conduct of CodePink and all of the Defendants.

The ATA provides a civil remedy to "[a]ny National of the US injured…by reason of an act of international terrorism." 18 USC. § 2333(a). Congress defined

"international terrorism" broadly. 18 USC. § 2331(1). Liability attaches not only to those who physically commit murder, bombings, or kidnappings, but also to conduct that "involve[s] violent acts or acts dangerous to human life" and is intended to intimidate or coerce. § 2331(1)(A)-(B). The Supreme Court has explained that even non-violent activities coordinated with an FTO are inseparable from its violent acts. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 26-27 (2010).

Terrorism is not defined solely by atrocities on the battlefield; it is equally defined by the exploitation of those atrocities to achieve political goals. The October 7 Attacks were designed to terrorize Americans, Israelis, and Jews worldwide, coerce Israel, and shape international opinion. That transformation from atrocity into terrorism required networks, infrastructure, propaganda, and mobilization, all of which CodePink helped provide. Without these networks, October 7 might have been a bloody crime. With them, it became effective terrorism, achieving the coercive impact Congress intended the ATA to remedy. That coordination is not incidental. It was foreseeable and deliberate.

The FAC pleads precisely that. CodePink repeatedly met with Hamas officials in Gaza who pledged safety for its delegations and entrusted it with a letter for delivery to President Obama—conduct calculated to "influence the policy of a government by intimidation or coercion" within the meaning of § 2331(1)(B) (FAC ¶ 210). It publicly endorsed PFLP terrorist Khalida Jarrar, engaged with Hezbollah, and coordinated with Iranian leadership (FAC ¶ 207). Domestically, it shared office space and personnel with NSJP, the Hamas-directed student arm that spearheaded campus propaganda, intimidation, and mobilization, and recruited

interns dedicated to "Palestine work" tied to Hamas's BDS National Committee (FAC ¶¶ 189, 209). The FAC traces this conspiracy from the 1993 Philadelphia meeting, through the creation of AMP and NSJP, to CodePink's sponsorship of the 2010 Social Forum that launched NSJP as Hamas's U.S. student arm (FAC ¶¶ 98, 144-50, 189, 406-07). Under Halberstam, all members of such a conspiracy are liable for injuries caused by acts in furtherance of it. 705 F.2d 472, 481 (D.C. Cir. 1983).

That campaign extended beyond October 7. Immediately afterward, NSJP issued its "Day of Resistance Toolkit," instructing SJP chapters to glorify Hamas's massacres and mobilize in their support (FAC ¶¶ 278-96). CodePink's close coordination with NSJP meant its infrastructure directly facilitated that dissemination. Hamas itself praised SJP and NSJP for their support, confirming the coordination was not independent student activity but recognized by Hamas as part of its campaign (FAC ¶¶ 374-79).

The FAC further alleges CodePink organized and endorsed violent mobilizations in the aftermath, including the Los Angeles synagogue confrontation and the White House encirclement where participants waved Hamas banners, chanted "Al Qassam make us proud, kill another soldier now," proclaimed "intifada revolution," and attempted to breach the White House fence while wearing Hamas headbands—forcing law enforcement to deploy tear gas (FAC ¶¶ 382, 386). These were not "advocacy" events but integral acts in a conspiracy designed to magnify Hamas's atrocities and intimidate civilians.

CodePink's reliance on *Chiquita*, *Stansell*, *Kaplan*, and *Newman* fails; those

cases concerned neutral, arm's-length services without defendant-specific coordination with a terrorist enterprise. Here, the FAC pleads deliberate coordination with Hamas and its U.S. arm. See *Boim*, 549 F.3d at 693-94).

CodePink wasn't simply an advocate for political causes but an active participant who ensured Hamas's violence resonated as terrorism. The ATA doesn't limit liability to those wielding the weapons. Those who publicize, justify, and mobilize in coordination with terrorism commit acts that "***involve*** violent acts" under § 2331(1) (emphasis added). Such promoters help accomplish the "intimidat[ion] or coerc[ion] of a civilian population," and "influenc[ing] the policy of a government by intimidation or coercion." 18 U.S.C. § 2331(1)(B)(i) and (ii). Plaintiffs' allegations plausibly state claims that Defendant itself committed acts of international terrorism.

## III.   Plaintiffs Plausibly Allege Aiding-and-Abetting Liability as to CodePink

The ATA imposes liability on any person who "aids and abets, by knowingly providing substantial assistance" to acts of international terrorism. 18 U.S.C. § 2333(d)(2). Courts evaluate such claims under the framework established in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), as adopted by the Supreme Court in *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023). To state a claim, Plaintiffs must allege (1) a principal committed an act of international terrorism, (2) the defendant was generally aware of its role in an unlawful enterprise from which terrorist acts were foreseeable, and (3) the defendant knowingly and substantially assisted the principal. *Taamneh*, 598 U.S. at 495-97. Courts then assess substantial assistance by reference to the six *Halberstam* factors.

The FAC pleads each element as to CodePink. Hamas committed the October 7 Attacks and subsequent acts that injured Plaintiffs. CodePink was generally aware of its role: repeated meetings with Hamas officials; public endorsement of designated terrorists and coordination with Hezbollah/Iran; and integration with NSJP's infrastructure (FAC ¶¶ 189, 207-210). The FAC situates these activities in a continuous conspiracy dating back to the Philadelphia meeting, through the creation of AMP and NSJP, including CodePink's sponsorship of the 2010 Social Forum "Palestine Program" that launched NSJP as Hamas's student arm (FAC ¶¶ 98, 144-50, 189, 406-07). After October 7, NSJP issued its "Day of Resistance Toolkit," directing chapters to glorify and mobilize around the massacres, and Hamas itself praised NSJP and SJP for their activities (FAC ¶¶ 278-96, 374-79).

Knowing and substantial assistance is plausibly alleged: just like the *Halberstam* bookkeeper, CodePink sustained the infrastructure that amplified Hamas's violence—even if not physically present at the attacks—constituting "conscious and culpable" participation. *Taamneh*, 598 U.S. at 493-97. The FAC alleges CodePink coordinated with Hamas's U.S. arm and organized mobilizations that reinforced Hamas's campaign of intimidation and coercion (FAC ¶¶ 189, 278-96, 382, 386). Such conduct is not expressive advocacy; it is concrete assistance that magnified Hamas's terrorism. See *Halberstam*, 705 F.2d at 488.

CodePink's authorities (*Linde v. Arab Bank*, 882 F.3d 314, *Newman v. Associated Press*, 758 F. Supp. 3d 1357, *Siegel v. HSBC*, 933 F.3d 217, *Bernhardt v. Iran*, 47 F.4th 856, and *Zobay v. MTN Group*, 695 F. Supp. 3d 301) involved neutral

services with lawful explanations. By contrast, the FAC pleads insider coordination with Hamas officials and with NSJP both before and after October 7.

At bottom, *Taamneh* and *Halberstam* ask whether the complaint pleads general awareness of participation in a violent enterprise and knowing, substantial assistance to the acts that injured Plaintiffs. The FAC does: CodePink's coordination with Hamas's U.S. arm, direct dealings with Hamas officials, role in founding NSJP, and post-attack mobilizations that glorified Hamas's atrocities plausibly allege aiding-and-abetting liability.

Applying the *Halberstam* factors confirms liability: the nature and amount of assistance to terrorist mass murder were grave and extensive; the kind of assistance was integral, as CodePink coordinated with Hamas and NSJP and mobilized amplifying the attacks; CodePink made October 7 resonate in the U.S., making presence in Israel irrelevant; the relationship is shown by its direct ties to Hamas operatives and with NSJP; and the state of mind and duration are shown by years of coordination and open support for Hamas's violence. These facts meet all six *Halberstam* factors for aiding-and-abetting liability.

## III.    The FAC Plausibly Alleges Conspiracy

ATA § 2333(d)(2) imposes secondary liability on "any person who conspires with the person who committed" an act of international terrorism. To plead such a claim, Plaintiffs need only allege facts that, taken as true, make an agreement—formal or informal—plausible, plus an overt act in furtherance and resulting injury. *Halberstam v. Welch*, 705 F.2d 472, 477; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57. *Twombly* requires enough factual matter to suggest an agreement; it does not

demand direct proof or meeting minutes. Agreements may be inferred from circumstantial evidence, including concerted conduct and a common design. Proof is not required that a defendant knew every detail; only knowledge of the conspiracy's essential objective. *U.S. v. Tamargo*, 672 F.2d 887 (11th Cir. 1982) (proof not required to show defendant knew every detail of the conspiracy; court also noted that defendant may be found guilty of conspiracy even if they played only a minor role in the overall scheme).

The FAC does exactly that as to CodePink. It alleges CodePink repeatedly met Hamas officials in Gaza, received assurances of protection, and carried a letter for delivery to the U.S. President—acts aimed at influencing U.S. policy through intimidation or coercion (FAC ¶ 210). It also alleges CodePink publicly endorsed PFLP terrorist Khalida Jarrar, engaged with Hezbollah, and coordinated with Iranian leadership (FAC ¶ 207). Domestically, CodePink coordinated with NSJP, shared office space and personnel, and recruited interns for "Palestine work" tied to the Hamas-linked BDS National Committee (FAC ¶¶ 189, 209). These actions fit within a continuous scheme from the 1993 Philadelphia meeting through the creation of AMP and NSJP, including CodePink's sponsorship of the 2010 U.S. Social Forum "Palestine Program" that launched NSJP as Hamas's U.S. student arm (FAC ¶¶ 98, 144-50, 189, 406-07). NSJP's own materials, including the post-October 7 "Day of Resistance Toolkit," confirm unity of purpose with Hamas and directed nationwide mobilization in support of its campaign (FAC ¶¶ 170, 199, 201-05, 220, 278-96, 301, 309, 321, 325, 393, 409).

The agreement element is plausibly pled through this integrated

infrastructure. CodePink's sponsorship of NSJP's launch, its shared personnel and workspace with NSJP, and its coordination with Hamas officials abroad are circumstantial facts from which a unity of purpose can be inferred. See *Halberstam*, 705 F.2d at 477; *Twombly*, 550 U.S. at 556-57; *Tamargo*, 672 F.2d 887.

The FAC also pleads overt acts and resulting injury. It alleges the conspiracy's U.S. expression was to embed Hamas's messaging across campuses for years, mobilize students, and generate intimidation and coercion, and it details the post-October 7 escalation under NSJP's banner, including dissemination and execution of the Toolkit and coordinated mobilizations that glorified the atrocities and produced violent confrontations, including at a Los Angeles synagogue and at the White House perimeter (FAC ¶¶ 224-70, 278-96, 374-79, 382, 386). Coupled with Hamas's public praise of SJP and NSJP, those are overt acts in furtherance of the common scheme that foreseeably caused Plaintiffs' injuries. *Halberstam*, 705 F.2d at 477; see 18 U.S.C. § 2331(1)(B).

CodePink's reliance on *Cain*, *Fullman*, *Williams*, and *Kearson* is misplaced. Those cases dismissed complaints that alleged only vague or parallel conduct or lacked overt acts. Here, the FAC pleads the who, what, when, where, and how, and specifies overt acts. Viewed together, these allegations plausibly state an agreement, overt acts, and injury under § 2333(d)(2). *Tellabs*, 551 U.S. at 322-23.

## V.    The FAC Plausibly Alleges Material Support in Violation of the ATA

ATA § 2333(a) provides a civil remedy to "[a]ny national of the U.S. injured…by reason of an act of international terrorism." 18 U.S.C. § 2333(a). That standard is met when a defendant violates § 2339B by "knowingly provid[ing]

material support or resources to a foreign terrorist organization." § 2339B(a)(1). "Material support" includes "any service [or] personnel." §2339A(b)(1).

The FAC alleges CodePink provided services and personnel: direct coordination with Hamas officials (including delivery of a Hamas letter to influence U.S. policy), integration with NSJP's infrastructure, and sponsorship that launched NSJP as Hamas's U.S. student arm (FAC ¶¶ 189, 209, 210, 406-07). These are not abstract expressions of political sympathy; they are pleaded as concrete services and personnel supplied in coordination with Hamas's U.S. infrastructure. Courts recognize such conduct as "material support." See *United States v. Suarez*, 893 F.3d 1330 (11th Cir. 2018) (propaganda and coordination with ISIS members constituted § 2339B violation); *Boim v. Holy Land Found.*, 549 F.3d 685, 698-702 (7th Cir. 2008) (en banc) (fundraising for Hamas fronts actionable under the ATA).

Scienter is adequately pled. Section 2339B requires only knowledge that the recipient is a designated FTO, not intent for a specific attack. See *Holder* 561 U.S. at 16. The FAC alleges CodePink coordinated with Hamas officials, praised designated terrorists, and embedded itself in NSJP, which declared itself part of Hamas's movement (FAC ¶¶ 170, 199, 201-05, 220, 278-96, 374-79). These facts plausibly allege knowledge that CodePink's services advanced Hamas's enterprise.

Finally, proximate cause is satisfied. Courts apply either a "direct relationship" or "substantial factor" test, but both require only that the defendant's support foreseeably furthered the terrorist campaign. See *Colon v. Twitter*, 14 F.4th 1213, 1223 (11th Cir. 2021); *Owens,* 897 F.3d at 273-75. The FAC alleges CodePink's infrastructure and propaganda ensured Hamas's October 7 atrocities

resonated beyond Gaza as terrorism—intimidating civilians, coercing governments, and fueling violent mobilizations in the U.S. (FAC ¶¶ 224-70, 278-96, 374-79, 382, 386). At minimum, CodePink's conduct was a substantial factor in achieving that coercive effect, and the outcome was foreseeable.

Defendants' reliance on *Newman* and *Kaplan* is misplaced. Those decisions involved neutral, arm's-length services (e.g., purchasing photographs) with obvious lawful explanations. By contrast, the FAC pleads defendant-specific coordination with Hamas officials, integration into its U.S. arm, and active operational support that glorified and amplified October 7. That is material support under § 2339B.

## V.    **Plaintiffs' Claims Target Unprotected Conduct, Not Protected Speech**

CodePink seeks to reframe this case as an effort to silence political advocacy against "genocide" or "occupation." That rhetoric is a deliberate attempt to inflame and distract. Plaintiffs target conduct—the coordinated provision of services, personnel, and infrastructure to Hamas and its U.S. arm—not viewpoints. The "knowing provision of material support to a foreign terrorist organization" is not protected speech, even if expressed through messaging or political activity. *Holder v. Humanitarian Law Project*, 561 U.S. at 26-27, 39; see *U.S. v. Jayyousi*, 657 F.3d 1085, 1102-03 (11th Cir. 2011); *U.S. v. Mehanna*, 735 F.3d 32, 45 (1st Cir. 2013). *Snyder* and *Claiborne* protect independent advocacy, not coordination with an FTO. Plaintiffs allege participation in Hamas's operational network—the machinery that turned the October 7 atrocities into effective terrorism by amplifying their coercive impact. The First Amendment does not shield that conduct.

## <u>CONCLUSION</u>

For these reasons, Plaintiffs respectfully request that Defendant's motion be

denied in its entirety and that they be permitted to proceed with their ATA claims.


Dated:    Brooklyn, New York
          October 16, 2025

                              Yours,

                              THE BERKMAN LAW OFFICE, LLC
                              *Attorneys* for Plaintiffs

                              by:    /s/ Robert J. Tolchin
                                     Robert J. Tolchin

                              829 East 15th Street, Box 7
                              Brooklyn, New York 11230
                              718-855-3627


Of Counsel:

NITSANA DARSHAN-LEITNER & CO.
Nitsana Darshan-Leitner
*Israeli Attorney for Plaintiffs*
10 Hata'as Street, Ramat Gan, 52512 Israel
Israeli #: 011-972-523-837-020
U.S. #: (212) 591-0073

## CERTIFICATE OF SERVICE

I hereby certify that this Motion filed through the ECF system is expected to be sent electronically to the registered participants as identified on the court's docket.

/s/Robert J. Tolchin
Robert J. Tolchin