# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

-------------------------------------------------------------------- X

MAURICE SHNAIDER, *et al.*,

                    Plaintiffs

        v.

AMERICAN MUSLIMS FOR PALESTINE, *et al.*

                   Defendants.

Case No: 8:24-cv-01067-MSS-SPF

-------------------------------------------------------------------- X

## PLAINTIFFS' OPPOSITION TO DEFENDANT RAFEEQ JABER'S MOTION TO DISMISS

The Court should deny the Motion to Dismiss filed by Defendant Rafeeq Jaber ("Jaber"). Defendant's arguments distort Plaintiffs' allegations and disregard the First Amended Complaint's ("FAC") detailed narrative. Contrary to Jaber's assertion that Plaintiffs have made only conclusory allegations, the FAC must be read as a whole. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007). When read as a whole, the FAC sets out a coherent and plausible narrative: after Hamas's prior U.S. fronts were dismantled, Jaber helped build and perpetuate the Hamas enterprise inside the U.S., reinforcing the infrastructure that projected Hamas's violent campaign onto U.S. soil and culminated in the October 7 terrorist attacks. Plaintiffs sue Jaber for his role within this coordinated enterprise.

The FAC outlines Jaber's involvement across multiple phases of the conspiracy. Years before the attacks, he led IAP/AMS, which the Seventh Circuit

found to be an alter ego of Hamas. *Boim v. Holy Land Found.*, 549 F.3d 685 (7th Cir. 2008). He participated in the Palestine Committee's 1993 Philadelphia meeting, where Hamas-aligned leaders planned strategies to influence U.S. institutions. (FAC ¶¶ 144–6). After IAP/AMS dissolved following *Boim*, Jaber helped reconstitute the same network by founding USPCN, which, together with AMP, established NSJP, the continuation of the Hamas-linked student infrastructure envisioned by the Palestine Committee. (FAC ¶¶ 57, 122, 130, 406–7). The FAC alleges that Jaber remained active in this network through his leadership roles in IAP/AMS and USPCN and his ties to AMP and NSJP. Before and after October 7, USPCN, AMP, and NSJP, organizations Jaber helped build, undertook coordinated actions alleged to advance the Hamas U.S. enterprise.

This conduct helped transform a localized massacre into international terrorism that achieved its intended coercive effect of intimidating civilians and influencing governments. If a terrorist bomb goes off in the forest and nobody hears it, it is not terrorism. October 7 and its aftermath became terrorism because Defendants supplied the machinery that made Hamas's violence resonate worldwide. The Motion should be denied.

## FACTUAL BACKGROUND

Plaintiffs are survivors and family members of victims of Hamas's October 7, 2023 terrorist attacks and their aftermath (the "October 7 Attacks"). They bring this action under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(a), (d), to hold Defendants civilly liable for knowingly aiding and abetting Hamas, providing material support, and conspiring in furtherance of acts of international terrorism.

The conspiracy traces back to the 1993 "Philadelphia meeting" of the

Hamas-affiliated Palestine Committee, where Hamas leaders in the U.S., including Sheikh Jamal Said, the IAP/AMS religious authority and Treasurer of a Treasury designated Hamas financier, planned to oppose the Oslo Accords by mobilizing youth, infiltrating universities, and building support for Hamas (FAC ¶¶ 144-5, 166). These early efforts planted the roots of AMP, NSJP, and the SJP chapters. Decades later, Jaber helped bring those plans to fruition by establishing infrastructure to bring Hamas's ideology into U.S. student movements.

After Hamas's earlier U.S. fronts, IAP/AMS and HLF, collapsed under the *Boim* litigation, AMP was formed in 2006 to carry forward the same ideology. *See Boim*, 549 F.3d 685. The FAC details leadership overlap and succession (FAC ¶¶ 114-22, 126-9).

From this foundation, NSJP emerged as Hamas's student arm in the U.S. The FAC alleges SJP chapters advanced Hamas's agenda, spreading propaganda and intimidating students for years prior to the October 7 Attacks (FAC ¶¶ 224-70). That alignment became unmistakable around October 7. Columbia SJP, for example, lay dormant for months before suddenly reactivating on October 5, 2023, two days before the attacks, posting "We are back!!" (FAC ¶ 297). After the massacre, NSJP issued its "Day of Resistance Toolkit," directing SJP chapters to fall into lockstep with Hamas and glorify the atrocities (FAC ¶¶ 278-96).

SJP chapters complied, harassing and intimidating Jewish students, praising Hamas "martyrs," and aligning with Hamas's calls (FAC ¶¶ 298–333, 380–6). Encampments formed nationwide, chanting "from the river to the sea" and "Intifada" (FAC ¶¶ 224, 288, 316, 326-7, 343–73). Hamas praised these campus

activities (FAC ¶¶ 374-9). These events triggered congressional investigations into AMP and NSJP/SJP chapters over Hamas ties (FAC ¶¶ 387-9).

Against this backdrop, Jaber's role is clear. As president of IAP/AMS, the organization the Seventh Circuit held to be an alter ego of Hamas in *Boim*, Jaber helped lead the very enterprise that later gave rise to NSJP. After IAP/AMS dissolved following the *Boim* litigation, Jaber helped reconstitute that infrastructure by founding USPCN, which, together with AMP, later established NSJP, the entity the FAC identifies as a continuation of the Hamas-linked student network envisioned by the Palestine Committee. (FAC ¶¶ 57, 122, 130, 406–407).

The FAC places Jaber among the individuals whose leadership carried the IAP/AMS/HLF enterprise into its modern form. He helped direct IAP/AMS until its wind-down, founded USPCN with former IAP leadership, and maintained an ongoing role across the successor entities alleged to support Hamas's objectives. (FAC ¶¶ 57, 107–9, 122, 130, 154, 166, 193, 406–13). For years before October 7, these organizations built and maintained the network alleged to facilitate Hamas's strategy in the U.S. Before and after the attacks, AMP, USPCN and NSJP, undertook coordinated actions described in the FAC as advancing the Hamas-linked enterprise which Jaber helped build.

The FAC also places Jaber within the conspiracy alleged: it identifies him as a longtime leader of IAP/AMS and a founder of USPCN, entities that, together with AMP and NSJP, carried forward the IAP/AMS and HLF enterprise into its modern iteration. These allegations are not stray or conclusory. They form part of a continuous pattern of conduct that advanced Hamas's campaign of intimidation

and coercion. Nor can Defendant escape liability by mischaracterizing the FAC's allegations about AMP's succession. Plaintiffs plead leadership overlap and organizational continuity, not conclusory labels.

Nor is the FAC a "shotgun pleading." Courts have consistently rejected that label where, as here, the complaint contains defendant-specific allegations. *Merino v Ethicon Inc.*, 536 F Supp 3d 1271 (SD Fla 2021); *Restless Media GmbH v Johnson*, 704 F Supp 3d 1288 (SD Fla 2023). This case is distinguishable from *Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313 (11th Cir. 2015). The FAC attributes specific roles and conduct while pleading the conspiracy's interconnected nature. Cross-references reflect coordinated roles among interlocking entities. The FAC traces a web from IAP/AMS and HLF to AMP, USPCN, and NSJP and identifies Defendant's role within it. Terrorism depends on each part of the network functioning together, and the FAC alleges Jaber's role as one part of that network.

Defendants' coordinated efforts legitimized, amplified, and operationalized October 7 and its aftermath to intimidate civilians, influence opinion, and pressure governments. The October 7 Attacks were inseparable from each Defendant's role: the violence became terrorism because it was publicized, amplified, legitimized, and mobilized through the networks they built. Jaber was part of this network. Unlike the age-old question of whether a tree falling in an empty forest makes a sound, terrorism depends on being heard. Publicity is the sine qua non of terrorism. That coercive impact, achieved by all of the Defendants' amplification and mobilization, defines "international terrorism" under the ATA. Jaber's longstanding leadership in IAP/AMS and his role in founding USPCN,

organizations that helped give rise to AMP and NSJP, formed a central part of the infrastructure that projected Hamas's violence beyond Israel and was the crux of the machinery that transformed Hamas's violence into effective terrorism.

## LEGAL STANDARD

A complaint survives a motion to dismiss under Fed. R. Civ. P. 12(b)(6) if it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). The standard requires more than possibility but less than probability. Courts disregard legal conclusions, accept well-pleaded facts as true, construe them in the light most favorable to plaintiffs, and ask if they plausibly give rise to relief. *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010); *Brooks v. Powell*, 800 F.3d 1295, 1300 (11th Cir. 2015). Allegations are assessed collectively, not in isolation. *Tellabs,* 551 U.S. at 322–23.

## ARGUMENT

### I.   The FAC Plausibly Alleges That Defendant Jaber Himself Committed Acts of International Terrorism

Plaintiffs sue Jaber over his role in transforming Hamas's October 7 atrocities into terrorism within the meaning of the ATA. Hamas carried out the violence; Defendants made it terrorism.

The ATA provides a civil remedy to "[a]ny National of the US injured…by reason of an act of international terrorism." 18 USC. § 2333(a). Congress defined "international terrorism" broadly. 18 USC. § 2331(1). Liability attaches not only to those who physically commit murder, bombings, or kidnappings, but also to conduct that "involve[s] violent acts or acts dangerous to human life" and is

intended to intimidate or coerce. § 2331(1)(A)–(B). Even non-violent activities coordinated with an FTO can be inseparable from its violent acts. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 26–27 (2010).

Terrorism is not defined solely by atrocities on the battlefield; it is equally defined by the exploitation of those atrocities to achieve political goals. The October 7 Attacks were designed to terrorize Americans, Israelis, and Jews worldwide, coerce Israel, and shape international opinion. That transformation required networks and mobilization, which Jaber helped provide. Without those networks, October 7 would be a bloody crime. With them, it became effective terrorism, achieving the coercive impact Congress intended the ATA to remedy.

The FAC pleads that Jaber served in longstanding leadership roles within the very organizations that carried forward the Hamas-supporting enterprise—first as president of IAP/AMS, and then as founder of USPCN—placing him at the center of the infrastructure that amplified Hamas's October 7 violence.

As president of IAP/AMS, the entity found to be an alter ego of Hamas in *Boim*, Jaber helped lead the earlier U.S. Hamas network (FAC ¶¶ 107–9). After IAP/AMS dissolved following *Boim*, he founded USPCN with former IAP/AMS leadership (FAC ¶ 130). USPCN and AMP later established NSJP, the continuation of the Hamas linked student infrastructure envisioned at the 1993 Philadelphia meeting (FAC ¶¶ 57, 122, 130, 406–7). Through these roles, Jaber sustained the coordinated enterprise alleged to support Hamas in the U.S. (FAC ¶¶ 406–13).

Jaber is sued for building and maintaining the organizational machinery that allowed Hamas's objectives to be disseminated and operationalized through

successor entities in the U.S. The FAC alleges that he helped direct IAP/AMS until its wind-down, reconstituted the same network through USPCN, and contributed to the formation of NSJP, which played a central role in the mobilization surrounding the October 7 Attacks (FAC ¶¶ 57, 107–9, 122, 130, 406–13). Before and after October 7, those entities undertook coordinated actions alleged to advance the Hamas-linked enterprise, including the activation of the student network, the NSJP "Day of Resistance Toolkit," and the post-attack mobilization across campuses (FAC ¶¶ 278–96, 408–12).

Defendant's reliance on *Chiquita Brands*, *Stansell*, *Kaplan*, and *Newman* is misplaced. Those cases involved routine conduct; here the FAC alleges direct coordination within Hamas's U.S. network. Nor can he evade scienter: his longstanding leadership positions within IAP/AMS and USPCN, the succession linking those entities to AMP and NSJP, and his participation in the Palestine Committee's aligned activities make awareness plausible. See *United States v. Suarez*, 893 F.3d 1330 (11th Cir. 2018).

Proximate cause under the ATA is shown by a direct relation or by showing substantial factor and foreseeability. *Newman* 758 F. Supp. 3d at 1380; *Colon v. Twitter, Inc.*, 14 F.4th 1213, 1223 (11th Cir. 2021). The FAC pleads both. It alleges a direct relationship between Jaber's organizational leadership—first in IAP/AMS, then in founding USPCN, and in helping give rise to NSJP—and the coordinated mobilization that amplified the October 7 Attacks into terrorism (FAC ¶¶ 406–13). It further alleges that his conduct was a substantial factor in magnifying the coercive effect because the very infrastructure he helped establish and sustain was activated

before and after the attacks (FAC ¶¶ 237–96, 408–12). These consequences were not only foreseeable; they were the very objectives of his coordinated enterprise formed at the Philadelphia meeting and perpetuated through IAP/AMS, USPCN, AMP, and NSJP, embedding Hamas's ideology into campus networks, fostering intimidation, and operationalizing Hamas-linked activity through NSJP/SJP, ensuring that the October 7 Attacks reverberated far beyond Israel and achieved their coercive effect on civilians and governments. Unlike *Owens*, 897 F.3d 266, involving remote financial services, Jaber's conduct is closely connected to the October 7 Attacks and their effectiveness as terrorism.

Jaber was not a neutral observer but an active participant who ensured Hamas's violence resonated as terrorism. The ATA doesn't limit liability to those wielding the weapons. Those who publicize, justify, and mobilize in coordination with terrorism commit acts that "***involve*** violent acts" under § 2331(1) (emphasis added). Such promoters help accomplish the "intimidat[ion] or coerc[ion] of a civilian population," and "influenc[ing] the policy of a government by intimidation or coercion." 18 U.S.C. § 2331(1)(B)(i) and (ii). Plaintiffs' allegations plausibly state claims that Defendant himself committed acts of international terrorism.

## II.    Plaintiffs Plausibly Allege Aiding-and-Abetting Liability as to Jaber

The ATA imposes liability on any person who "aids and abets, by knowingly providing substantial assistance" to acts of international terrorism. 18 U.S.C. § 2333(d)(2). Courts evaluate such claims under the framework established in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), as adopted by the Supreme Court in *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023). To state a claim, Plaintiffs must allege (1) a principal committed an act of international terrorism, (2) the

defendant was generally aware of his role in an unlawful enterprise from which terrorist acts were foreseeable, and (3) the defendant knowingly and substantially assisted the principal. *Taamneh*, 598 U.S. at 495–97.

The FAC pleads all three elements as to Jaber. First, Hamas, a designated FTO, committed the October 7 Attacks and subsequent acts of international terrorism that injured Plaintiffs. Second, Jaber was generally aware of his role in Hamas's U.S.-based support network; awareness does not require knowledge of the specific October 7 Attacks and its aftermath, only recognition of participation in an enterprise where terrorist violence is a foreseeable outgrowth. *Halberstam*, 705 F.2d at 472; *Taamneh*, 598 U.S. at 495. Plaintiffs allege that IAP/AMS, the organization Jaber led, was found by the Seventh Circuit to be an alter ego of Hamas, and that after IAP/AMS dissolved in the wake of the *Boim* litigation, Jaber reconstituted the same infrastructure by founding USPCN, which, together with AMP, later established NSJP to coordinate more than 200 SJP chapters pursuing the Palestine Committee's university-infiltration strategy ((FAC ¶¶ 57, 107–9, 122, 130, 144–53, 406–7). Within this successor network, Jaber's leadership positions—first at IAP/AMS, then at USPCN, and later in connection with AMP and NSJP—embedded the same Hamas-aligned enterprise across multiple organizational iterations. These allegations show far more than isolated associations; they plead Jaber's central role in sustaining and advancing the Hamas enterprise in the U.S. and make plausible his general awareness that his activities were part of an enterprise from which terrorist violence was both intended and foreseeable.

Third, Jaber knowingly and substantially assisted Hamas's enterprise. Like

the *Halberstam* bookkeeper, he provided essential organizational support that maintained the infrastructure without being physically present at the attacks. That suffices for "knowing and substantial assistance." Defendant seeks to recast the allegations as mere "speech" or "advocacy" divorced from terrorism. That misstates the FAC. Jaber did not merely attend conferences or express political views; he led IAP/AMS, Hamas's alter ego; participated in the Palestine Committee's coordinated strategy discussions, including the 1993 Philadelphia meeting (FAC ¶¶ 144–146); directed IAP/AMS through its wind-down; and founded USPCN with former IAP leadership to carry forward the same enterprise (FAC ¶¶ 57, 107–9, 122, 130). The FAC further pleads that USPCN and AMP established NSJP to institutionalize the Palestine Committee's Hamas-aligned student infrastructure across more than 200 campuses (FAC ¶¶ 130, 406–7), an infrastructure that for years before October 7 intimidated students on college campuses. NSJP later issued the "Day of Resistance Toolkit" (FAC ¶¶ 278–96) and coordinated the mobilization surrounding the October 7 Attacks, including harassment of Jewish students, praise of "martyrs," and encampments Hamas publicly lauded (FAC ¶¶ 298–379, 408–412). These were overt acts carried out through the very channel Jaber helped build and the mechanism through which Hamas's intimidation infrastructure operated in the U.S.

The *Halberstam* factors confirm liability: the nature of the act assisted—terrorist mass murder—is grave; the amount and quality of Jaber's assistance—longstanding organizational leadership and operational continuity—were substantial; presence in Israel is irrelevant as his roles ensured October 7 and its

aftermath resonated globally as terrorism; his relationship to the tortfeasor is direct, given IAP/AMS's alter-ego status, the Palestine Committee alignment, and the continuity through USPCN, AMP, and NSJP, ensuring NSJP and SJP functioned as Hamas's student arm; his state of mind is plausibly alleged through participation in the 1993 strategy meeting, leadership of IAP/AMS, and founding USPCN; and his assistance spanned decades.

Defendant argues the FAC pleads only "First Amendment activity." Not so. Providing personnel, training, or services to an FTO is not immunized by free-speech principles. *Holder*, 561 U.S. at 26–27. Jaber's role was not abstract advocacy; it was organizational leadership, structural rebuilding, and coordinated participation in the infrastructure that enabled Hamas's messaging, mobilization, and intimidation strategy to function in the U.S. Plaintiffs sue Jaber for his operational role in building and perpetuating the network that transformed Hamas's violence into effective terrorism. These allegations are far more than conclusory or speech based. They plead knowing and substantial assistance to Hamas's enterprise and show Jaber's general awareness that such participation would foreseeably further terrorist violence by enabling networks to function as instruments of intimidation and coercion. That conduct ensured Hamas's terrorism resonated in the U.S. and falls squarely within the ATA's prohibitions.

Defendant Jaber filed his Motion to Dismiss on November 20, 2025, relying heavily on *Parizer v. AJP Educ. Found., Inc.*, 2025 WL 2382933 (E.D. Va. Aug. 15, 2025). But on November 7, 2025, the *Parizer* plaintiffs filed a Notice of Appeal challenging the dismissal (Notice of Appeal, *Parizer v. AJP Educ. Found., Inc.*, No.

1:24-cv-00724-RDA-IDD (E.D. Va. Nov. 7, 2025), ECF No. 165), and on November 13, 2025, the Fourth Circuit formally opened Appeal No. 25-2366 (Fourth Circuit Docketing Notice, *Parizer v. AJP Educ. Found., Inc.*, No. 25-2366 (4th Cir. Nov. 13, 2025)). Thus, the decision on which Jaber principally relies is not final and is currently under appellate review, weakening its persuasive value.

Even on its own terms, *Parizer* is inapposite. *Parizer* alleged only an aiding-and-abetting theory and was dismissed because the plaintiffs, all of whom were injured on October 7, relied on post-attack propaganda to connect defendants' conduct to their injuries. This case is fundamentally different in two respects.

First, Plaintiffs do not rely solely on aiding-and-abetting. The complaint asserts direct liability under § 2333(a), conspiracy under JASTA, and material-support liability under § 2339B. These claims rest on allegations that Defendants themselves committed acts of "international terrorism" within the meaning of § 2331(1) by sustaining Hamas's U.S. infrastructure, disseminating Hamas propaganda, and coordinating campus mobilizations. The terrorism that harmed Plaintiffs was not confined to Israel. It became terrorism because Defendants gave it reach and coercive force, amplifying Hamas's atrocities and ensuring they were received as intimidation and coercion against civilians and governments.

Second, unlike *Parizer*, this case involves Plaintiffs harmed both on and after October 7. The October 7 Plaintiffs plausibly allege direct liability, as well as aiding and abetting, conspiracy, and material support, because Defendants' propaganda and mobilization apparatus, for years before, on, and after October 7, gave Hamas's atrocities their coercive impact, transforming mass murder into terrorism within a

global campaign of intimidation. Plaintiffs injured after October 7 plausibly allege all four theories because Defendants' post-attack conduct, including dissemination of NSJP's "Day of Resistance" toolkit and coordination of campus mobilizations, directly furthered Hamas's continuing terrorism, including rocket fire, hostage-taking, intimidation of Jews worldwide, and campaigns aimed at coercing governments and international institutions.

Moreover, the *Parizer* court granted leave to amend, recognizing that more specific allegations could cure its narrow pleading concerns. That recognition alone undermines Defendants' argument that *Parizer* forecloses liability here. Plaintiffs go well beyond what *Parizer* found lacking: they plead multiple independent bases for liability, tie Defendants' conduct directly to both October 7 and post October 7 harms, and allege Defendants' own acts of international terrorism.

Because *Parizer* is on appeal and thus not a settled or authoritative construction of JASTA or § 2333, its limited reasoning provides no basis for dismissing this action. If anything, *Parizer*'s procedural posture confirms that the law in this area is developing and that dismissal here would be premature.

## III.    The FAC Plausibly Alleges Conspiracy

ATA § 2333(d)(2) imposes secondary liability on "any person who conspires with the person who committed" an act of international terrorism. Plaintiffs need only plausibly allege an agreement (formal or informal), an overt act, and injury. *Halberstam* 705 F.2d at 477; *Twombly,* 550 U.S. at 556–57. An agreement may be proved by circumstantial evidence. Proof is not required that the defendant had knowledge of all the details of the conspiracy; the defendant need only have

knowledge of the essential objective. *U.S. v. Tamargo,* 672 F2d 887 (11th Cir 1982*).*

The FAC does so as to Jaber. It alleges that he served as president of IAP/AMS, the organization the Seventh Circuit held to be an alter ego of Hamas; participated in the 1993 Philadelphia meeting where Hamas-aligned leaders discussed coordinated strategy, including university infiltration (FAC ¶¶ 144–6); directed IAP/AMS through its dissolution after *Boim*; and founded USPCN with former IAP leadership to carry forward the same enterprise (FAC ¶¶ 57, 107–9, 122, 130). The FAC further alleges that USPCN, together with AMP, established NSJP, the national hub coordinating more than 200 student chapters and institutionalizing the Palestine Committee's Hamas-aligned university strategy (FAC ¶¶ 50, 130, 406–7). These are overt acts advancing Hamas's conspiracy.

AMP's and USPCN's lineage as successor to IAP/AMS and HLF situates Jaber's role within a conspiracy already judicially tied to Hamas (*Boim*, 549 F.3d at 698–702), making it plausible he acted with knowledge of its objective. As *Holder* explains, support for an FTO's "social" or "advocacy" activities advances the organization as a whole, including its violent ends, because such support is fungible and legitimizing. *Holder,* 561 U.S. at 30–39. The FAC alleges that the same enterprise, beginning with the Palestine Committee's 1993 strategy, continuing through IAP/AMS and HLF, and reconstituted through USPCN, AMP, and NSJP, shared a unified objective aligned with Hamas's coercive program.

The "agreement" element is plausibly pled through the infrastructure and mission the FAC describes and into which Jaber's role fits. NSJP was founded in 2010 by AMP and USPCN leaders as an umbrella for over 200 SJP chapters to

propagate the Palestine Committee's, and Hamas's, strategy in U.S. universities. The conspiracy's blueprint reaches back to the 1993 Philadelphia meeting, where leaders discussed "infiltrat[ing] universities" and developing youth curricula to ensure a "next generation" hostile to peace. The FAC ties those objectives forward through IAP/AMS/HLF, USPCN, AMP, and finally to NSJP's self-identification as "the student movement" and "PART" of the movement that includes Hamas, and "call[s] for mass mobilization" (FAC ¶¶ 170, 199, 201-5, 220, 278–296, 301, 309, 321, 325, 393, 409). That is the hub that Jaber's leadership positions supported.

Defendant invokes *Freeman*, *Newman*, and *Bernhardt* which involved independent or neutral objectives. Here, the shared objective is the Palestine Committee's Hamas-aligned plan of intimidation and coercion, which the FAC alleges Jaber helped initiate, preserve, and transmit across successive organizations. See *Freeman*, 57 F.4th at 80; *Newman*, 758 F. Supp. 3d at 1374; *Bernhardt*, 47 F.4th 856. The FAC pleads that NSJP functioned as Hamas's U.S. student arm, publicly aligned with Hamas to intimidate, and that USPCN and AMP established and sustained that infrastructure for years before, during, and after October 7.

Jaber's conduct underscores knowledge and participation. His leadership of IAP/AMS, his participation in the Palestine Committee's 1993 strategy meeting, and his founding of USPCN with former IAP personnel place him at the origin point of the infrastructure that had been developing and operating for years and that fueled the coercive program reflected in the October 7 Attacks. Plaintiffs allege that Jaber helped build and sustain the machinery advancing Hamas's coercive objectives and operationalized Hamas's student arm in the U.S.

Under *Halberstam*, it is sufficient he joined the shared objective of advancing Hamas's program of intimidation and coercion that culminated in and was amplified by the October 7 Attacks. By helping build and perpetuate the enterprise through which Hamas's messaging, mobilization, and intimidation were carried out through IAP/AMS, USPCN, AMP, and NSJP, Jaber ensured that the October 7 Attacks were experienced and understood as terrorism intended to intimidate and coerce civilians in the U.S. and abroad. That is a pleaded unity of purpose, not parallel conduct. *Freeman*, 57 F.4th at 80; *Newman*, 758 F. Supp. 3d at 1374.

This is not conclusory. The FAC pleads who formed NSJP (AMP and USPCN leaders), when (2010), for what purpose (national hub coordinating 200+ SJP chapters), why (to carry forward the Palestine Committee's university-infiltration plan), and how Jaber fits (leadership of IAP/AMS, participation in the Philadelphia meeting, founding USPCN, and sustaining the successor network)—facts that, taken as true, plausibly allege an agreement.

The FAC also pleads overt acts and injury: embedding Hamas's messaging across campuses for years, mobilizing students, generating intimidation and coercion that constitute international terrorism under the ATA and resulted in harm to Plaintiffs, and escalating these efforts after October 7 through the toolkit and coordinated campus actions (FAC ¶¶ 224–96, 374–79). Together with NSJP's self-identification with Hamas and Jaber's role in building the enabling infrastructure, these are overt acts furthering the common scheme.

## IV.    The FAC Plausibly Alleges Material Support in Violation of the ATA

ATA § 2333(a) provides a civil remedy to "[a]ny national of the U.S.

injured…by reason of an act of international terrorism." 18 U.S.C. § 2333(a). That requirement is satisfied where a defendant violates § 2339B by "knowingly provid[ing] material support or resources to" an FTO. § 2339B(a)(1). "Material support" includes "any service [or] personnel." §2339A(b)(1).

The FAC alleges that Jaber provided "services" and "personnel" within the meaning of § 2339B by helping build and sustain the U.S. infrastructure tied to Hamas. It pleads that he led IAP/AMS, founded USPCN after its dissolution, and that USPCN and AMP later created NSJP to coordinate more than 200 campus chapters in furtherance of the Palestine Committee's strategy (FAC ¶¶ 57, 107–09, 122, 130, 406–07). These roles constitute the provision of organizational services and personnel to entities alleged to act as intermediaries for Hamas's objectives.

The FAC additionally alleges that the infrastructure Jaber helped create and sustain ultimately issued the NSJP "Day of Resistance Toolkit," coordinated the post–October 7 mobilizations, and amplified Hamas's messaging, glorification of violence, and intimidation of Jewish students (FAC ¶¶ 278–96, 298–379, 408–412). These are allegations showing the provision of structure, organization, and personnel for Hamas's U.S. arm, in direct coordination with a designated FTO. Courts hold that propaganda, recruitment, and operational assistance are "material support." *Suarez*, 893 F.3d 1330 (11th Cir. 2018); *Boim* 549 F.3d at 698–702.

Defendant argues no "objective observer" could conclude he intended the October 7 Attacks. That misstates the FAC. Section 2339B requires only that he knew the organization he supported was a designated FTO, not that he intended a specific attack. The FAC alleges that Jaber held longstanding leadership roles

within the same Hamas-aligned infrastructure—leading IAP/AMS, participating
in the Palestine Committee's 1993 strategy meeting, and later founding USPCN to
carry that enterprise forward (FAC ¶¶ 57, 107–9, 122, 130, 144–6). Through these
roles, he provided personnel and services to the U.S. network alleged to advance
Hamas's mobilization and intimidation strategy. This is far more than attendance
or association; it constitutes material support to a designated FTO under § 2339B.

Nor is scienter lacking. Jaber's leadership of IAP/AMS, his role in the 1993
Palestine Committee meeting, his founding of USPCN, and his continuation of the
enterprise through AMP and NSJP all make plausible his awareness that he was
materially supporting Hamas. His roles fit squarely within the successor network
that the FAC alleges carried forward the Hamas-supporting enterprise dismantled
in *Boim*. Awareness under § 2339B does not require knowledge of the specific
attacks; it requires knowledge of the FTO's status and the nature of the enterprise
supported, which the FAC plausibly alleges.

Finally, proximate cause is satisfied under either articulation recognized in
ATA cases. Jaber's creation and leadership of the infrastructure that embedded
Hamas's ideology and mobilized NSJP and SJP chapters, amplifying messaging
and glorifying the October 7 massacre, bears a direct relationship to the
intimidation and coercion that transformed those atrocities into terrorism. At
minimum, his conduct was a substantial and foreseeable factor in producing the
coercive effect Hamas intended. See *Colon v. Twitter, Inc.*, 14 F.4th 1213, 1223 (11th
Cir. 2021); *Owens v. BNP Paribas S.A.*, 897 F.3d 266, 273 (D.C. Cir. 2018).

Plaintiffs need not trace every operational step between Jaber's conduct and

the October 7 Attacks. It is enough that the FAC plausibly alleges he knowingly provided services and personnel to the enterprise alleged to serve as Hamas's U.S. infrastructure, materially supporting its campaign of intimidation and coercion. That is precisely what § 2339B forbids.

## V.    Plaintiffs' Claims Target Unprotected Conduct, Not Protected Speech

Defendant reframes this as an attempt to silence disfavored political views. Plaintiffs do not challenge Jaber's abstract advocacy or political expression. They challenge his knowing provision of personnel, services, and organizational infrastructure to Hamas's U.S. network, conduct that falls squarely within the ATA prohibitions. The Supreme Court has made clear that "providing personnel, training, or services to an FTO" is not immunized by the First Amendment. *Holder, 561 U.S. at 26–27, 39; see United States v. Jayyousi, 657 F.3d 1085, 1102–03 (11th Cir. 2011); United States v. Mehanna, 735 F.3d 32, 45 (1st Cir. 2013).*

Jaber is sued for helping build and sustain the Hamas aligned enterprise through IAP/AMS, USPCN, and the successor entities that carried that infrastructure forward by reconstituting it after *Boim*, sustaining its leadership, and maintaining the machinery through which Hamas's mobilization and intimidation strategy operated in the U.S. Plaintiffs are not seeking to punish dissent but to hold Jaber accountable for his operational contribution to the network that helped turn the October 7 Attacks from isolated atrocities into effective terrorism.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court deny Moving Defendant's motion and allow this case to proceed under the ATA.

Dated:    Brooklyn, New York
November 26, 2025

Yours,

THE BERKMAN LAW OFFICE, LLC

*Attorneys for Plaintiffs*

by:    /s/ Robert J. Tolchin
           Robert J. Tolchin
829 East 15th Street, Box 7
Brooklyn, New York 11230
718-855-3627

Of Counsel:

NITSANA DARSHAN-LEITNER & CO.

Nitsana Darshan-Leitner, *Israeli Attorney for Plaintiffs*

10 Hata'as Street, Ramat Gan, 52512 Israel

Israeli #: 011-972-523-837-020 | U.S.: (212) 591-0073

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this Motion filed through the ECF system is expected to be sent electronically to the registered participants as identified on the court's docket.

/s/Robert J. Tolchin
Robert J. Tolchin